UNITED STATES of America,
Plaintiff–Appellee,

v.

Jesus ZAMBRANA, Sr., Charles Cole
and Jay Zambrana,
Defendants–Appellants.

Nos. 86–1115, 86–1402 and 86–1501.

United States Court of Appeals,
Seventh Circuit.

Argued May 26, 1987.

Decided March 7, 1988.

As Amended March 8 and 21, 1988.

Armand L. Andry, Oak Park, Ill., Hugo E. Martz, Valpariso, Ind., for defendants-appellants.

Gregory A. Vega, Asst. U.S. Atty., James G. Richmond, U.S. Atty., Hammond, Ind., for plaintiff-appellee.

Before WOOD, CUDAHY, and COFFEY, Circuit Judges.

COFFEY, Circuit Judge.

The defendants/appellants, Jesus Zambrana, Sr., Jay Zambrana, and Charles Cole are three of 32 codefendants indicted on various drug charges, including charges of

possession of cocaine with intent to distribute in violation of 21 U.S.C. § 841, conspiracy to distribute cocaine in violation of 21 U.S.C. § 846, and using a telephone in furtherance of the conspiracy in violation of 21 U.S.C. § 843(b). Each defendant was individually tried and convicted. Each of the three defendants appeals his conviction on similar, although not identical, grounds. We affirm the conviction of each defendant.

I

The thirty-two indictments handed down against the members of this conspiracy were the result of months of investigation on the part of the United States Drug Enforcement Agency (the "DEA") into the activities of a suspected cocaine-distribution network in northern Indiana. The DEA coordinated their investigation with a number of local law enforcement agencies. Eventually, the investigation focused on the defendant-appellant Jesus Zambrana's family and his associates. Because the conspirators were in large part family[1] members, undercover agents did not attempt to infiltrate the group. Instead, on the basis of information received from confidential informants, the government petitioned the district court to authorize the placement of an electronic surveillance wire tap on Jesus Zambrana's private telephone between March and July, 1985. Information received over this wire tap during the week prior to April 25, 1985, led law enforcement officers to believe that Ernest Lonzo and another unknown individual were transporting narcotics from Miami, Florida, to Jesus Zambrana's residence in Gary, Indiana. On the basis of this wire tap information, DEA agents, with the assistance of police officers from Lake County, Indiana, and East Chicago, Indiana, initiated the surveillance of Interstate Highway I-65 in the vicinity of Crown Point,

Indiana, at approximately 8 p.m. on April 25, 1985. Before commencing the surveillance, a DEA agent met with Lake County, Indiana, police officers and provided them with a list of five individuals suspected as being involved in the transportation of narcotics between Florida and Indiana, as well as a list of four vehicles believed to be used by these suspects.

At approximately 9 p.m. on April 25, during their surveillance of I-65 near the northbound ramp of Indiana Highway # 231, Lake County, Indiana, Police Officer Timothy Downs and DEA Special Agent Michael Ehrsam observed a rose-colored Oldsmobile Delta 88 traveling northbound on I-65, well below the speed limit, and floating from one lane to another.[2] Because Officer Downs believed that the vehicle was being driven in an erratic manner, he followed the car for some four miles and pulled the driver over on suspicion of drunk driving.

Following the stop of the Oldsmobile, the driver produced a driver's license identifying him as Ernest Lonzo, whose name was referred to in the DEA's list of those suspected in the transportation of narcotics from Florida to Indiana. The passenger identified himself as Charles Cole, one of the defendants-appellants.[3] After using Lonzo's driver's license for an I.D. check, Officer Downs arrested Lonzo for driving with a suspended license and conveyed Lonzo and Cole to the Lake County, Indiana, jail. Cole was released shortly thereafter.

After Lonzo's arrest, the Oldsmobile was transported to and impounded in the Lake County, Indiana, police garage. On the following day, April 26, 1985, DEA Special Agent Elaine Harris obtained a warrant from a United States magistrate in Ham-

---

1. Throughout this opinion we use the term "family" in the ordinary and accepted sense, i.e., to connote those persons related by blood or marriage.

2. The list provided by the DEA referred to a Cadillac or Buick but not a rose-colored Oldsmobile.

3. Cole's name was not referred to on the DEA's list of those suspected of being involved in the transportation of narcotics.

mond, Indiana, authorizing a search of the automobile.[4] Later that day, she and East Chicago police officer Fernando Villicana proceeded to search the vehicle. During the search, Officer Villicana discovered a hidden compartment in the trunk of the car. The compartment contained six packages of cocaine with an estimated street value of $2,000,000, as well as $960 in cash. Luggage containing items of clothing was also found in the trunk of the vehicle. Following the car search but before the custodial inventory of the Oldsmobile's contents, the police mistakenly released the vehicle to an unauthorized individual without removing the personal effects contained in the automobile referred to above. Police retrieved the car three days later, but the contents of several of the suitcases had been removed.

**4.** The defendants do not challenge on appeal the validity of the search of Lonzo's car.

**5.** Examples of the content of the taped conversations are contained in the government's brief. For instance:

"... [in] discussions between Zambrana and co-defendant Antonio Dominguez on April 13, 1985 at 11:51 A.M., and April 15, 1985 at 8:04 P.M. (Ex. Z 101, 102), ... [they] discussed the availability of a car with the 'part' and the need of a car with the 'part' before being able to travel.

Thereafter, on April 20, 1985, at 11:30 A.M., Jay informed Dominguez that the car was available and that it was ready to leave with 'the two who went the last time, the two black guys.' Dominguez told Jay that the paint was 'soft' and 'metallic.' (Ex. Z 104) Several telephone conversations were then had between Zambrana, Jay, Dominguez, and co-defendant Roberto Rodriguez on April 21, 1985 at 12:47 P.M., and April 22, 1985 at 9:22 P.M., concerning whether the boys had left and why they were delayed in their arrival. (Ex. Z 109, 110) Zambrana informed Dominguez in cryptic language 'the plane flight is a bit late because it seems the road was messed up' and 'they told me they lost about three or four hours.'

On April 22, 1985 at 11:19 P.M., Zambrana received a call from Dominguez who stated Cole and co-defendant Ernest Lonzo were lost about forty-five minutes from where they were to meet. Dominguez arranged for a three-way conversation and instructed Zambrana to give Cole and Lonzo directions to Miami Beach where they (Cole and Lonzo) were to meet Dominguez. (Ex. Z 112; Ex. C 104). On the following day at 5:58 P.M.,

Each of the defendants was tried separately on the various drug and wire fraud charges. The wire tap on Jesus Zambrana's telephone produced the bulk of the evidence introduced by the government to link the Zambranas (Jesus and his son Jay) and Charles Cole with the attempted delivery of the seized cocaine from Florida to Indiana. In each defendant's trial, the evidence against the defendants consisted primarily of approximately thirty of these tapes (two to three hours of a total three thousand six hundred hours during the time Zambrana's telephone was monitored), which contained conversations between Jay and Jesus Zambrana and several co-conspirators, including Ernest Lonzo. Although the word "cocaine" was never referred to in the telephone conversations,[5] the government contended at trial that the cryptic language used in the conversations, com-

Dominguez called Zambrana and told him that he had found a car with the prettiest metallic paint he had ever seen but that the price had gone up and consequently Zambrana had to go up in price 'one dollar per car.' (Ex. Z 114).

On April 25, 1985 at 3:19 P.M., Jay called Dominguez and was informed by Dominguez that he (Dominguez) had sent his 'six uncles' and that he 'had placed a note in one of his uncles pockets.' (Ex. Z 118; Ex C 107) Shortly thereafter at 6:33 P.M., Ernest Lonzo called Zambrana's residence seeking Jay to inform him they 'were 10 miles out of Lafayette' and would arrive around 10:00 P.M. (Ex. Z 119; Ex. C 108) Surveillance was immediately set by the DEA on Interstate I-65, the most direct route between Lafayette, Indiana and Gary, Indiana in an attempt to intercept the shipment of suspected narcotics being transported by Cole and Lonzo to Zambrana.

The seizure of the six packages containing 5,847.01 grams of cocaine on April 25, 1985 caused additional calls between Zambrana and Dominguez. On April 28, 1985 at 8:50 P.M., Dominguez, apparently unaware that the cocaine had been seized, called Zambrana and inquired whether his 'father arrived.' Zambrana informed Dominguez that they had 'a small problem' that 'the kid had a suspended license' and that 'they took the car with a tow truck.' Dominguez did not understand what Zambrana was trying to tell him. (Ex. Z 120) Dominguez called again later that day and on the following day in an attempt to find out what happened to the cocaine and what Zambrana was trying to tell him. Dominguez ordered Zambrana to call him 'from the street' so they could 'talk straight.' (Ex. Z 121, 122)"

bined with the context of the statements and other circumstantial evidence in the case, indicated that the speakers were referring to Cole and Lonzo's planned delivery of cocaine to the Zambrana residence on April 25.

These taped conversations (spoken in a mixture of English and Spanish) were played to the jury and/or judge at each defendant's trial, respectively. As an aid to the jurors while listening to the tapes, the trial court allowed the jurors to use transcripts of those conversations containing a government-prepared translation to English of the Spanish excerpts of the recordings. Two expert language translation witnesses, Victoria Funes and Ava Cooper, testified as to the accuracy of the government's translation.[6] The court admitted only the two to three hours of tape, but not the government-prepared transcripts of those tapes, as substantive evidence. Additionally, the names of the persons speaking on the tapes were inserted in the margin of the transcripts.

The evidence against the defendant-appellant Charles Cole was largely circumstantial, as in many conspiracy cases. The government introduced a number of the tape-recorded conversations between the Zambranas and the other co-conspirators relating to Cole's trip to and from Florida with Lonzo in an attempt to demonstrate that Cole was a knowing participant in the delivery scheme. Cole, on the other hand, testified that he did not know Lonzo was transporting cocaine and that his only purpose for traveling with Ernest Lonzo to and from Miami on April 22, 1985, was to look for a job. Cole also stated that his luggage contained his resumes, along with the classified advertising sections of vari-

ous Georgia and Florida newspapers listing a number of job openings he had circled, and a folder with materials on how to look for a job. He further testified that he had prepared his resume during a four-week course he had taken earlier in the year on conducting a job search. Although Cole alleged that he was going to Florida to look for a job, on cross-examination, Cole also testified that: (1) he could not remember the names of any persons he talked to in Florida about locating a job; (2) he could not remember the name of even one business where he had allegedly left his resume; (3) he didn't know which cities they were going to or where or how long they would stay; and (4) Lonzo asked Cole to go to Florida with him only about two hours before they actually departed.

Further, contrary to Cole's assertion that his luggage contained resumes, Special Agent Harris testified that her search of Cole's luggage and her search of the entire vehicle failed to reveal the existence of any resumes, much less any other job search material. Cole asserted at trial that his job search materials, including the resumes that he allegedly had printed earlier in the year and had brought with him to Florida, must have been lost when the vehicle was mistakenly released.

Jesus Zambrana was tried before a jury on October 21, 1985, and convicted on all but four of the counts set forth in the indictment, and was sentenced to a term of forty (40) years of imprisonment. Jay Zambrana's case was tried without a jury to the court; the judge found him guilty of 22 of the indictments charged and sentenced him to a term of thirty-five (35) years of imprisonment. Charles Cole was charged in five counts of the indictment,

---

**6.** Ava Cooper, a special agent for the DEA who testified in the government's case, was born in Honduras and lived in that country for 13 years. During that time she learned and spoke only Spanish. She also completed one year at the University of Honduras, where all courses were taught in the Spanish language. She testified that she reads, speaks, and writes both English and Spanish fluently. Over the defendants' objections, the district court qualified her as an expert in the translation of English to Spanish and Spanish to English. She testified that based

upon her review of the government's translation of the transcripts from Spanish to English, it was her expert opinion that the translations were accurate.

Victoria Funes, who has been certified to interpret the Spanish language in U.S. courts pursuant to 28 U.S.C. § 1827, was also certified by the trial court as an expert witness. She testified that in her opinion, the government transcripts contain accurate verbatim translations of the taped Spanish conversations introduced during each of the defendants' trials.

and a jury returned a verdict of guilty on all counts. Cole was sentenced to a term of two (2) years of imprisonment.

Because Jesus and Jay Zambrana's contentions on appeal are the same, we address their arguments jointly. Although Cole adopted all of his co-defendants' arguments in his brief, he raises two other specific contentions in his particular case: (1) that the government's loss of Cole's alleged resumes constitutes a violation of his due process rights under *Brady v. Maryland,* and (2) that the trial court's admission of the aforementioned tapes against him constitutes reversible error since the conversations contained in the tapes consisted of inadmissible hearsay.

## II

Initially we address an argument posed solely by the defendant-appellant Jesus Zambrana. Jesus Zambrana maintains that the trial court abused its discretion when it denied his motion for continuance of the trial date set for October 21, 1985. A brief review of the time frame leading up to his trial is necessary to an analysis of this contention.

Jesus Zambrana was arrested on July 23, 1985, and on the same day the government moved for his detention prior to trial pursuant to 18 U.S.C. § 3142(e) based upon the likelihood that Zambrana, if released on bail, would flee and/or pose a danger to the community. Following his detention hearing, a United States magistrate ordered that Zambrana be detained and set his arraignment for August 2, 1985. During the first week of August 1985, the government provided defense counsel with the government's applications for the wire tap, as well as copies of the court orders authorizing the wire taps of Jesus Zambrana's home telephone. The government also provided DEA investigation reports to counsel for Jesus Zambrana on September 10 and September 25. Two weeks prior to trial, on October 7, 1985, Zambrana filed a motion for a continuance of the trial date, alleging that the government's failure to turn over tapes to the defendant prevented him from adequately preparing for an October 21

trial. However, the defendant had access to *all* tapes as early as September 10, 1985, approximately six weeks prior to trial, *see infra* note 7, and on October 9 (12 days before trial) the government provided defense counsel with copies of the specific excerpts of the taped conversations that the government intended to introduce at trial, as well as a transcript of those excerpts. The district court denied Zambrana's request for a continuance on October 11, 1985.

Even though the government delivered to the defendant 12 days before trial the short, two-to-three-hour segment it proposed to introduce at trial, along with its translation of those tapes, and despite the fact that defense counsel had complete access to every tape in the government's possession six weeks prior to trial, Zambrana contends that the government's failure to turn over the two-to-three-hour portion of the tapes and government-prepared translation of those tapes until 12 days before trial made it impossible for his counsel to adequately prepare his case, especially since many of the tapes contained Spanish conversations. Zambrana argues that due to the late production of the tapes, he did not have time to prepare his own translation of the conversations as an alternative to the government's translation, which he asserts is inaccurate. Additionally, at oral argument counsel stressed that his inability to review the tapes prior to October 9 and confront his client with the evidence contained therein prevented him from meaningfully advising his client whether or not to enter a plea of guilty. Moreover, counsel asserts that he had absolutely no opportunity to review tapes other than those the government intended to introduce at trial; and therefore he did not have the opportunity to determine whether or not other conversations taped during five months of surveillance contained exculpatory evidence or whether they revealed a context for statements made in the portion selected by the government for introduction at trial.

The disposition of a request for a continuance is within the trial court's discretion.

*See Avery v. Alabama,* 308 U.S. 444, 446, 60 S.Ct. 321, 322, 84 L.Ed. 377 (1940) ("[d]isposition of a request for a continuance is ... made in the discretion of the trial judge, the exercise of which will ordinarily not be reviewed"); *United States v. Bush,* 820 F.2d 858, 860 (7th Cir.1987); *United States v. Miller,* 573 F.2d 388, 394 (7th Cir.1978) ("[i]t is well established that such decisions [whether to grant a continuance] are left to the discretion of the trial court and are not reversed except upon a showing of abuse of that discretion"). In *United States v. Uptain,* 531 F.2d 1281 (5th Cir.1976), the Fifth Circuit stated:

> "A motion for a continuance is addressed to the sound discretion of the trial court, and its ruling will not be disturbed on appeal unless there is a showing that there has been an abuse of that discretion.... This issue must be decided on a case-by-case basis in light of the circumstances presented, particularly the reasons for continuance presented to the trial court at the time the request is denied...."

*Id.* at 1285–86 (citations omitted). In *Bush,* 820 F.2d at 860, this court adopted the list of factors set forth in *Uptain* as "highly relevant" when a court considers whether to grant or deny a motion for a continuance based on an allegation that the defendant had inadequate time to prepare his defense. The *Uptain* court stated:

> "We have deemed the following factors highly relevant in assessing claims of inadequate preparation time: the quantum of time available for preparation, the likelihood of prejudice from denial, the accused's role in shortening the effective preparation time, the degree of complexity of the case, and the availability of discovery from the prosecution. We have also explicitly considered the adequacy of the defense actually provided at trial, the skill and experience of the attorney, any pre-appointment or pre-retention experience of the attorney with the accused or the alleged crime, and any representation of the defendant by other attorneys that accrues to his benefit."

531 F.2d at 1286–87 (footnotes omitted).

In considering the factors enumerated above, we note that:

(1) Zambrana was arraigned on August 2, 1985. Considering that his trial date was set for October 21, 1985, he had some two and one-half months to prepare for trial, more than ample time;

(2) Contrary to Zambrana's suggestion, a review of the record reveals that the case was not overly complex. The government's case he allegedly had difficulty preparing for included the swearing of only 11 government witnesses in addition to the playing of a mere two hours of taped conversation with an accompanying translation from Spanish to English, and a trial that lasted only four days;

(3) The tapes and the government's translations of those taped conversations that the government intended to introduce at trial were provided to defense counsel 12 days prior to trial, and *all tapes* were made available to counsel for Zambrana as early as September 10, 1985;[7]

(4) In spite of his protestations that he had inadequate time to prepare for trial, Zambrana in fact produced the testimo-

---

**7.** A letter dated September 10, 1985, to defense counsel from an assistant U.S. attorney states as follows:

> "Enclosed please find the DEA Report of Investigation forms specifically concerning your client, Jesus Zambrana, Sr. Included in the reports is the laboratory analysis regarding the narcotic drugs referred to in Count 4 of the indictment.
>
> After reviewing the enclosed materials if you have any questions, please do not hesitate to write or call me....
>
> As indicated to you previously, tapes of the intercepted wire communications are avail-

able for your listening and recording. To arrange a time to listen to the tapes, please contact Special Agent Elaine Harris of the DEA.... Unfortunately, the transcriptions of the intercepted communications have not yet been completed and therefore are not available at the present time. It is anticipated that the transcriptions will be complete within the next two weeks."

The record is barren of evidence that the government refused to honor the terms of this letter.

ny of an expert witness in an attempt to establish the inaccuracy of the government-prepared transcripts, and counsel repeatedly emphasized in his argument that the word "cocaine" was never used in any of the conversations; counsel's ability to produce an expert to challenge the accuracy of those transcripts demonstrates that his expert witness must have had time to adequately prepare to testify and weighs against his claim that he suffered prejudice through his inability to mount an effective challenge to the accuracy of the government's translations.

■ In his brief and at oral argument, Zambrana argues that the government's alleged continued failure (during trial and on appeal) to allow him to examine the tape-recorded conversations involving his client has prejudiced his ability to defend himself. The government disputes this assertion, and the record contradicts his allegations. As stated above, the government's letter of September 10, 1985, informed defense counsel that the tapes existed and formally invited counsel to review the tapes. See *supra* note 7. The record further fails to support the defendant's assertion that the government refused to honor this invitation or that it withheld any of the tapes from the defendants. To the contrary, the record reveals that counsel for the defense had more than ample opportunity to review each and every one of the tapes desired and had adequate time to prepare his defense as well as properly advise his client whether or not to enter a plea of guilty, but for some reason chose not to avail himself of the opportunity to review the tapes. Consequently, his allegation that the government failed to provide him with an adequate opportunity to review the tapes falls on deaf ears. In the course of representing a defendant, we remind defense counsel that it is incumbent upon him to make specific requests for specific evidence in the possession of the prosecution, and it is not the responsibility of the prosecutor or the judge to do the work of the defense counsel. *See Ruiz v. Cady,* 710 F.2d 1214, 1218 (7th Cir.1983).

Where counsel fails to meet this obligation, he cannot shift the responsibility to the government for his failure to properly organize his allotted time in preparation for trial to take advantage of the opportunity to review the evidence the government offered.

■ While the time between arraignment and trial is mandated by the Speedy Trial Act, the Act allows the trial judge, in the exercise of his discretion, to grant a continuance if certain circumstances exist. *See* 18 U.S.C. § 3161. But, at the same time, the interest of allowing trial judges to effectively monitor their overworked court calendars necessitates that latitude be afforded the district court to deny continuance motions when appropriate. *United States ex rel. Kleba v. McGinnis,* 796 F.2d 947, 952 (7th Cir.1986). In *Kagan v. Caterpillar Tractor Company,* 795 F.2d 601 (7th Cir.1986), we stated that:

"Trial judges have a responsibility to litigants to keep their court calendars as current as humanly possible. This is not an easy task in view of the nearly impossible demands placed on trial judges in the overburdened federal court system.... [A]s of June 30, 1985, the average number of cases pending on a district judge's calendar was 643. Thus, if a trial judge does not closely monitor his calendar and prevent needless delay, he would soon be buried beneath the pending case load."

*Id.* at 608. "It is critically important that a trial court be able to maintain control over its calendars and that a trial date once set must be adhered to unless there are compelling reasons for granting a continuance." *Stevens v. Greyhound Lines Inc.,* 710 F.2d 1224, 1230 (7th Cir.1983). In light of these concerns and the circumstances outlined above, we hold that the trial court did not abuse its discretion in refusing to grant Zambrana a continuance.

### III

Each of the defendants challenge the legal sufficiency of the affidavits filed in support of the government's application for the court-authorized electronic surveillance

of Jesus Zambrana's private home telephone. Essentially, they launch a two-pronged attack on the sufficiency of the affidavits: they contend that (1) other investigative techniques should have been attempted prior to the wire tap application; and (2) the applications were based on unreliable hearsay.

In the first prong of their argument the defendants maintain that the government's wire tap application and its supporting affidavits failed to comply with the requirements of 18 U.S.C. § 2518(1)(c):

> "(1) Each application for an order authorizing or approving the interception of a wire or oral communication shall be made in writing upon oath or affirmation to a judge of competent jurisdiction and shall state the applicant's authority to make such application. Each application shall include the following information: ... (c) *a full and complete state ment as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous.*"

(Emphasis added). Because subsection (c) of the statute is worded in the disjunctive, the government is required to establish the need for electronic surveillance by demonstrating one of the three alternatives listed above. *See United States v. Steinberg*, 525 F.2d 1126, 1130 (2nd Cir.1975), *cert. denied*, 425 U.S. 971, 96 S.Ct. 2167, 48 L.Ed.2d 794 (1976).

The Supreme Court has noted that § 2518 was enacted in order "to make doubly sure that the statutory authority be used with restraint and only where circumstances warrant the surreptitious interception of wire and oral communications. These procedures [are] not to be routinely employed as the initial step in criminal investigation." *United States v. Giordano*, 416 U.S. 505, 515, 94 S.Ct. 1820, 1826–27, 40 L.Ed.2d 341 (1974). Our Circuit recognizes that "the government's burden of

establishing its compliance with [subsection 2518(1)(c)] is not great," and that the requirement that the government exhaust "normal investigative procedures" be reviewed in a "practical and common-sense fashion." *United States v. Anderson*, 542 F.2d 428, 431 (7th Cir.1976). *See also United States v. Costello*, 610 F.Supp. 1450, 1464–68 (N.D.Ill.1985), *aff'd sub nom., United States v. Olson*, 830 F.2d 195 (7th Cir.1987), *cert. denied*, —— U.S. ——, 108 S.Ct. 708, 98 L.Ed.2d 658 (1988).

■ With these general principles in mind, we turn to the application and affidavits supporting the issuance of the orders authorizing the electronic telephone wire interception and surveillance of Jesus Zambrana's home telephone. Initially, the defendants contend that the information in the application was insufficient on its face in that it failed to establish that "normal investigative procedures"[8] had been tried and had failed. Given that the statute does not require that other investigative procedures actually be implemented before an order may be issued for the interception of wire communications, the defendant's argument is without merit: "[i]t is not required that a wire tap be used as a last resort, but only that the success of other methods of investigation appear unlikely." *Anderson*, 542 F.2d at 431 (quoting *United States v. Whitaker*, 343 F.Supp. 358, 362–63 (E.D. Pa.1972)).

■ Defendants further argue that the government's application for electronic telephone wire surveillance under § 2518(1)(c) failed to demonstrate a factual basis for its "statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous." In reviewing a challenge to the "necessity" of a wire tap, we apply an abuse of discretion standard, giving substantial deference to the

---

**8.** Congress envisioned normal investigative procedures as including:

"... [1] standard visual or aural surveillance techniques by law enforcement officers, [2] general questioning or interrogation under an immunity grant, [3] use of regular search warrants, and [4] the infiltration of conspiratorial groups by undercover agents or informants." U.S.Code Cong. & Ad.News 1968, pp. 2112, 2190. *See Costello*, 610 F.Supp. at 1465.

determination of the issuing judge. *United States v. Brown,* 761 F.2d 1272 (9th Cir.1985); *United States v. Alonso,* 740 F.2d 862, 868 (11th Cir.1984), *cert. denied,* 469 U.S. 1166, 105 S.Ct. 928, 83 L.Ed.2d 939 (1985). In *Brown,* the Ninth Circuit held:

"... Our review of the district court's determination under this statute [§ 2518(1)(c)] is deferential. We review the findings of probable cause under the same standard as for a search warrant, ... to be sure it had a substantial basis.... Although we examine de novo whether 'a full and complete statement' was submitted meeting section 2518(1)(c)'s requirements, ... *we review conclusions that wiretaps were necessary in each situation only for an abuse of discretion....*"

761 F.2d at 1275 (emphasis added) (citations omitted). In this circuit, we will affirm a district court's "finding that normal investigative procedures [were] unlikely to be successful ... [as long as] there exist[ed] a factual predicate in the affidavit." *Anderson,* 542 F.2d at 431 (quoting *United States v. Armocida,* 515 F.2d 29, 38 (3rd Cir.1975)). *See also In re DeMonte,* 674 F.2d 1169, 1174 (7th Cir.1982).

To bolster the government's application for an authorized wire tap of the Zambrana phone, Agent Harris's affidavit filed with the district court explains the "necessity" for the surveillance:

"¶ 36 Normal investigative techniques, while they have been successful in this investigation to a limited extent, appear unlikely to succeed in accomplishing the goals of identifying all co-conspirators at all levels of the narcotics conspiracy leading to a successful prosecution of the individuals who finance, import, distribute, purchase, sell or otherwise participate in narcotic sales. In particular, *normal investigative techniques appear unlikely to succeed for the following reasons:*

(a) *Surveillance* of the subjects and/or any of the premises associated with the subjects *must be conducted in a limited fashion in order avoid alerting the subjects to the fact that they are under investigation.* Further, surveillance alone would not provide sufficient evidence of the violations identified in paragraph 2 of this affidavit.

(b) *Search warrants are not a viable alternative since* at this time, *there are no agents or other prospective witnesses who could provide information as to a location where the Zambrana organization conceal narcotics and/or records pertaining to narcotic transactions.* Further, isolated seizures of either narcotics or records without direct evidence on members of the organization, would not further the ends of this investigation.

(c) It has been affiant's experience, as well as the experience of other DEA agents who have investigated drug violations that narcotics dealers frequently do not keep permanent records. If such records have been maintained, narcotics dealers immediately prior to and during a physical search attempt to destroy their records and narcotics if they can. There is no information in the present investigation which would indicate that Jesus Zambrana or Jay Zambrana or anyone within the organization maintains any records relative to any other drug transactions, whether it concerns purchasers or suppliers.

(d) *Because the Zambrana organization is a closely run family organization, it is unlikely that an undercover agent could infiltrate into the top echelon of the organization.* It further appears that an informant would not be able to infiltrate into the organization to the extent necessary to expose the full extent and membership of the criminal narcotics conspiracy and enterprise. *It also appears that an attempt to infiltrate by either an agent or an informant would pose a high risk to the safety of the individual.*

(e) *Use of telephone pole records and pen registers to record numbers dialed from various telephones show what numbers have been called.* However, such evidence does not indicate the time, place or manner of delivery of the controlled substances or the distribution of

the controlled substances. Nor does such evidence specify the roles, positions and participation of the callers and callees in the distribution network of which Jesus Zambrana and Jay Zambrana are a part. Such evidence, in fact, does not even identify the callers or the callees. At best, it provides contact between subscribed to telephone numbers.

(f) Due to the manner in which the violations are carried out, the interception of these communications appears to be the only available method of investigation which has a reasonable likelihood of securing the evidence necessary to prove the commission of violations identified in paragraph 2 above."

(Emphasis added).

█ Based upon this affidavit, and Agent Hildebrand's affidavit (substantially the same as Harris's), the district court held that the government's application met the requirements of § 2518(1)(c). The court ruled:

"They [the affiants] stated that they [Agents Harris and Hildebrand] both are personally involved in the investigation and that they have also relied on reports made by other DEA agents and law enforcement officers. Further, Agent Harris states that normal investigative techniques, while they have been successful in this investigation to a limited extent, did not appear likely to succeed in accomplishing the goals of identifying all co-conspirators at all levels of the narcotics conspiracy. In addition, Agent Harris's affidavit informed the Court that telephone poll records and pen registers had been used to determine what numbers were being dialed to and from the telephone of Jesus Zambrana, Sr. In addition, Agent Harris's affidavit informed the Court that the Zambrana organization was a closely run family organization and that it appeared unlikely that an undercover agent could infiltrate into the top echelon of the organization."

(Order of October 18, 1985, at 2). We agree with the district court that the information contained in the Harris and Hildebrand affidavits satisfies all of the elements of § 2518(1)(c) (even though, as explained previously, only *one* of the alternative elements must be established by the government) because:

(1) The affidavits explain "whether or not other investigative procedures have been tried and failed." 18 U.S.C. § 2518(1)(c). They state that normal investigative procedures have been successful only to a limited extent, but "appear unlikely to succeed in accomplishing the goals of identifying all co-conspirators at all levels of the narcotics conspiracy" (Harris affidavit ¶ 36). Although the government did not articulate the factual basis in detail for its representation that other investigative procedures had been attempted (except for a summary of its use of telephone pole records and pen registers), as explained below, we are convinced that because it is reasonably unlikely that other investigative procedures would secure the necessary information about the conspiracy, the lack of detail as challenged by the defendant about the other methods of investigation actually attempted by the government is not fatal;

(2) The affidavits detail why ordinary investigative procedures "reasonably appear to be unlikely to succeed if tried." 18 U.S.C. § 2518(1)(c). Of the numerous valid reasons furnished by the government, the fact that the Zambrana organization was a very closely knit family organization comprised exclusively of family members and trusted friends is most compelling. Because the participants in this conspiracy are one closely knit family unit, it is nigh onto impossible that an undercover agent could even hope to infiltrate "the top echelon of the closely run family organization," and the defendants have failed to present to us even one instance and/or case where this has been achieved. Similarly, relying on common sense and taking judicial notice of the clandestine and life-threatening manner in which a drug conspiracy operates, it is ridiculous to presume that the government could obtain wit-

nesses with first-hand knowledge of the group's activities. An affidavit supplied by a DEA agent in *Steinberg, supra,* is on point:

"My experience and the experience of other special agents of the Drug Enforcement Administration has shown that individuals dealing in large quantities of narcotics are particularly covert in their activities and wary of surveillance by Federal and State law enforcement personnel. Such dealers very rarely keep records, deal personally with a very few trusted individuals and isolate themselves from other individuals in the distribution organization."

525 F.2d at 1130.

(3) The affidavits properly note that ordinary investigative procedures (such as infiltration by an undercover agent) would pose a high risk to the safety of a government agent or informant, and therefore "appear to be ... too dangerous." 18 U.S.C. § 2518(1)(c).

From our review of the record, we are satisfied that the government has complied with the statutory mandate contained in § 2518; we note further that no alternate plan of infiltration of the conspiracy has been advanced by the appellants that would have been likely to ascertain the details of the Zambrana operation as opposed to electronic wire surveillance.

■ Additionally, the defendants argue that the Harris and Hildebrand affidavits are unreliable because they are based on the hearsay declarations of an undisclosed government informant. Where, as in the instant case, a probable cause finding is based in part upon information provided through the use of confidential informants, the credibility and reliability of the informants must be demonstrated utilizing the "totality of the circumstances" test set forth in *Illinois v. Gates,* 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983). *See also United States v. Hornick,* 815 F.2d 1156, 1158 (7th Cir.1987). Under this test, "[t]he task of the issuing [judge] is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place. And the duty of a reviewing court is simply to ensure that the [judge] had a 'substantial basis for ... conclud[ing]' that probable cause existed." *Illinois v. Gates,* 462 U.S. at 238–39, 103 S.Ct. at 2332 (quoting *Jones v. United States,* 362 U.S. 257, 271, 80 S.Ct. 725, 736, 4 L.Ed.2d 697 (1960)).

Again, turning to the affidavits filed in support of the wire tap, Agent Harris testified that two confidential informants known as "CI–3" and "CI–4" had first-hand knowledge of the details of the Zambrana drug distribution operation. According to Harris's affidavit, Informant CI–3 provided her with information concerning Zambrana's distribution of narcotics.[9] The general reliability of CI–3's information had also been demonstrated to be reliable through his work with the government on previous occasions.[10] The reliability of CI–3's infor-

---

**9.** Harris's affidavit states that since March 1984 CI–3 has provided information about the Zambrana operation, including:

"(a) the residential address and private telephone number for Jesus Zambrana and Jay Zambrana, ...

(b) that Jesus Zambrana could deal in kilo quantities of heroin and cocaine,

(c) that Jesus Zambrana was dealing in stolen vehicles and other illegal chop shop activities, ...

(d) that the stolen vehicles may be used in the transportation of drugs from one state to another, and

(e) that others associated with Jesus Zambrana and Jay Zambrana in the distribution of narcotics, included Foster Harris, Pedro Villarreal, Martin Enrique, Ernest Lonzo and Robert Rosario."

**10.** According to Harris's affidavit:

"On or about August 25, 1980, CI–3 provided information to the ECPD concerning stolen property from Schoeneberg Furniture in East Chicago, Indiana. A search warrant was obtained and executed resulting in recovery of the stolen property. On or about February 13, 1981, CI–3 provided information concerning stolen property concealed in the residence of Robert Rosario which resulted in the recovery of the property and Rosario's conviction. CI–3 has also been used by ECPD and the Hammond Police Department, with DEA as-

mation was also verified in part when he introduced Agent Harris to Foster Harris, from whom Agent Harris was able to purchase heroin and cocaine on four occasions. Additionally, CI-4 informed Agent Harris that CI-4 had been present when Robert Rosario obtained heroin, marijuana and cocaine from the residence of Jesus Zambrana.[11]

■ There is no doubt that the informational tips from CI-3 and CI-4 were sufficient to establish probable cause under *Illinois v. Gates, supra,* since the government demonstrated that CI-3 had provided reliable information in the past, and since his reports were corroborated in part at the time CI-3 introduced Agent Harris to Foster Harris. (CI-3 stated that the drugs Foster Harris sold to Agent Harris came from the Zambrana operation). Since there is evidence in the record that independent police work corroborated CI-3's information, this case is similar to our recent decision in *United States v. Hornick,* 815 F.2d 1156 (7th Cir.1987), where we held that a police officer's gathering of evidence to

sistance, to make introductions of undercover officers to purchase narcotics. In [sic] or about June 1980, CI-3 introduced undercover Hammond Police Officer James Lawson to Jessie Sanchez, who sold phencyclidine (PCP) to the officer, which resulted in Sanchez' arrest and conviction. On or about September 3, 1980, CI-3 introduced Officer James Lawson to Roy McArthur, who sold cocaine to the officer, which resulted in McArthur's arrest and conviction. On September 29, 1980, CI-3 introduced undercover officer James Lawson to Reynaldo Ortiz. A purchase of narcotics was made resulting in Ortiz' conviction. On or about February 2, 1981, CI-3 introduced undercover DEA agent Richard Hahner to George Justiz, who sold the agent 10 lbs. of marijuana, resulting in Justiz' arrest and conviction.

On May 7, 1980, CI-3 was given two polygraph examinations, one dealing with information provided concerning drug activities and the other with information concerning the death of a person. CI-3 tested as truthful on the drug information and deceptive on the other."

11. Although the accuracy of CI-4's information could not be independently verified, the circumstances of his interview, along with the information provided separately by CI-3, tend to indicate that his information was reliable. At the time of the interview, CI-4 was being treated for injuries including a concussion, dog bites and a broken jaw he had received from a brutal attack which he believed was motivated as an attempt by members of the Zambrana organization to kill him because he had learned too much about their operation. Harris's affidavit states that:

"CI-4 advised affiant and the other officers as follows:

... On November 23, 1984, CI-4 had been abducted by Robert Rosario, his brother Eddie Rosario and a third person, and taken to 3500 Pennsylvania Street, Gary, Indiana. At that location, he was beaten by those persons, but was able to escape from them by jumping from a second floor window and fleeing the area.

... CI-4 believed they were attempting to kill him because he had inadvertently learned too much about the activities of the Zambrana organization.

... CI-4 became associated with Robert Rosario in July, 1984, and thereafter assisted him in the distribution of narcotics in the Gary and East Chicago, Indiana areas. CI-4 stated that Rosario operated his drug business out of two locations: 3500 Pennsylvania Street, Gary, Indiana and 3501 Fir Street, Apartment D, East Chicago, Indiana.

... On several occasions, CI-4 had accompanied Rosario to a "farm" where there were lots of animals and cars, and located on the "farm" was a barn where they had rooster or cock fights. Rosario introduced CI-4 to a young Latin male known only to CI-4 as "JaJo". It was the usual practice for CI-4 to wait in the car for Rosario to return from the house with the drugs, which included heroin, marijuana and cocaine. However, on one occasion, he went into the house and saw two uniformed police officers with JaJo and Rosario while cocaine was visibly present. JaJo, when he saw CI-4, became upset with Rosario for having brought CI-4 into the house and told Rosario to get CI-4 out. CI-4 was later told by Rosario that JaJo had a list of officers receiving payoffs.

... CI-4 indicated that some of the vehicles used to transport drugs by Rosario were stolen and had been kept on the "farm". CI-4 advised that Rosario told him that they would move drugs from New York, Florida and California to Indiana in cars from the "farm", which CI-4 believed was at JaJo's direction.

... CI-4 stated that on another occasion, CI-4 had seen a Chinese man and his wife arrive at the farm with over $60,000.00 to purchase drugs. CI-4 had been parked nearby with the windows down and was in a position to hear and see part of the transaction.

... CI-4 also stated that he had been approached by Pedro Villarreal, another associate of JaJo's, to 'do something' to CI-3 because JaJo wanted him killed. CI-4 was told that JaJo wanted CI-3 killed because 'he runs his mouth with the Feds.'"

corroborate an informant's report established probable cause under *Gates.* In *Hornick,* the government's application for a search warrant was supported with a lengthy affidavit from an officer of the Madison, Wisconsin, police department. The court summarized the information contained in the affidavit as follows:

> "The star of this application was 'MPD 840,' who knew that Hornick [the defendant] and a companion were headed to Florida to pick up cocaine. According to the application MPD 840 had supplied reliable information on more than 20 occasions in the past, had observed Hornick in possession of large quantities of cocaine and had learned about the next trip. The officers verified part of this tip by watching Hornick and companion leave, as predicted, for Florida. The ticket clerk told them that Hornick and his companion had paid cash for two round-trip tickets; Hornick's was issued in someone else's name. The police had a warrant waiting when he returned. (His companion, John T. Myers, had 347 grams of cocaine in his boots when arrested; Myers pleaded guilty unconditionally.)"

815 F.2d at 1158. As in the instant case, because the informant's report in *Hornick* was corroborated in part by the information gained through police officers' surveillance of the defendants, the court held that the informational tip from MPD 840 was sufficient to establish probable cause under *Gates.* In the case at bar, Agent Harris's independent corroboration of CI–3's statements demonstrates CI–3's reliability and, like the officer's corroboration of MPD 840's information in *Hornick,* establishes probable cause under the *Gates* test.

■ Finally, defendants argue that the affidavits filed in support of the government's application for a wire tap were unreliable because they were based upon the reports of an undisclosed informant whose reliability could not be tested in open court. Answering the same argument in *Hornick,* we stated:

> "... This is altogether too easy. *The confidentiality of many informants must be maintained to protect their safety.* The drug business contains some nasty, vindictive people. A bald denial of the existence of an informant does not call for a hearing; *Franks* [*v. Delaware,* 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978) ] held that the defendant bears a substantial burden to demonstrate probable falsity [of the information in the officer's affidavit]. 438 U.S. at 171–72, 98 S.Ct. at 2684."

815 F.2d at 1158 (emphasis added). A case decided two years ago clearly illustrates the need to maintain the confidentiality of government informants. In *Ellsworth v. City of Racine,* 774 F.2d 182, 183–84 (7th Cir.1985), *cert. denied,* 475 U.S. 1047, 106 S.Ct. 1265, 89 L.Ed.2d 574 (1986):

> "Paul Ellsworth was an undercover narcotics officer employed by the Police Department of Racine, Wisconsin. Because of the testimony he was to give against individuals arrested as a result of an undercover investigation, Mr. Ellsworth and his family became the target of threats from underworld figures. In response to these acts of intimidation, the police department assigned an officer to protect Ms. Ellsworth for the eight hours each day that her husband was working. On July 21, 1980, Ms. Ellsworth and her bodyguard saw an automobile driving slowly past the Ellsworth home. At 6:30 p.m. the same day Ms. Ellsworth released her bodyguard from duty. Shortly thereafter, Ms. Ellsworth went into her backyard looking for her dog. While outside, she was attacked by a masked man who told her to 'tell the pig to keep his mouth shut.' The man beat Ms. Ellsworth severely."

In order to preserve the confidentiality of government informants and to protect their safety, the Supreme Court in *Franks* held that a hearing on the reliability of an informant is required only after the defendants have made a preliminary showing that a knowingly false statement was contained in the warrant affidavit. 438 U.S. at 171, 98 S.Ct. at 2684. The defendants' bald assertions that the informants' testimony was unreliable merely because the informants' identities were not revealed falls far short

of establishing that the officers knowingly filed a false affidavit. Accordingly, we reject the defendants' claim that the affidavits were defective merely because the identity of the informants providing the information to support the wiretap application remained undisclosed.

### IV

The defendants next challenge the procedure that the trial court utilized in providing the jury with government-prepared, written transcripts of conversations between the various co-defendants translated from Spanish into English. The district judge allowed the jury to use the transcripts as an aid while listening to tape recordings only during the presentation of the testimony at trial but did not allow the transcripts to go to the jury room nor was the jury allowed to consider them as substantive evidence. During final instructions, the judge instructed the jury to resolve any discrepancies between the tapes and the transcripts in favor of the tapes, and that the names in the margins they had observed during trial were not to be considered as evidence of the identities of the speakers.[12]

█ Defendants contend that (1) the English transcripts of the intercepted Spanish conversations provided the jury contain numerous inaccuracies; and (2) the transcripts should not have included the names of the purported speakers since the procedure used to identify some of the voices on the tapes was improperly suggestive. We consider each of these arguments in light of the well-established rule that "[c]ourts possess wide discretion in determining whether to permit the jury to use written transcripts as aids in listening to tape recordings." *United States v. Keck*, 773 F.2d 759, 766 (7th Cir.1985). *See also*

*United States v. Puerta Restrepo*, 814 F.2d 1236, 1242 (7th Cir.1987). The defendants initially maintain that the transcripts inaccurately reproduce the substance of the phone conversations. However, the record reveals that they had ample opportunity to challenge and did in fact challenge each and every portion of the government-prepared transcript through the cross-examination of the government witnesses who testified as to the accuracy of the government's translation. In addition, in spite of the defendant's having had access to all the tapes six weeks prior to trial, having had the transcript for 12 days prior to trial, and having produced their own expert witness to testify as to the accuracy of the government's translation, the defendants failed to present an alternative translation. Because the defendants had ample opportunity to either challenge specific portions of the government's transcript or to prepare an alternate version, they cannot now be heard to complain on appeal when they themselves failed to present an alternative transcript. We agree with the reasoning of the Fifth Circuit in *United States v. Llinas*, 603 F.2d 506 (5th Cir.1979) where the defendants challenged on appeal the accuracy of transcripts containing an English translation of taped Spanish conversations. The court held that " '[o]nce we have concluded that the defendants could have challenged specific portions of the government's transcript or prepared an alternate version, it follows that they cannot be heard to complain on appeal because they failed to take advantage of their trial opportunity.' " 603 F.2d at 509 (quoting *United States v. Wilson*, 578 F.2d 67, 70 (5th Cir.1978)).

█ We agree with the procedure used in the Fifth and Eleventh Circuits for re-

12. Final Instruction # 25 states:
"Tape recordings of telephone conversations have been admitted in evidence. Written transcripts of those conversations have been presented to you for the purpose of aiding your evaluation of the tape recordings. These transcripts should be used by you as an aid in light of all the evidence submitted in this case. However, the tape recordings are evidence in the case and the transcripts are not evidence.

If you perceive any variation you will be guided solely by the tape recordings and not by the transcripts.

If, during your deliberations, you wish to hear the tape recordings they will be played for you in open court and copies of the transcripts will be provided during the playing of the tapes. However, because the transcripts are not evidence, copies will not be sent to the jury room."

solving challenges to the accuracy of transcripts:

"Initially, the district court and the parties should make an effort to produce an 'official' or 'stipulated' transcript, one which satisfies all sides. If such an 'official' transcript cannot be produced, then each side should produce its own version of a transcript or its own version of the disputed portions. In addition, each side may put on evidence supporting the accuracy of its version or challenging the accuracy of the other side's version.

This procedure is well suited to cases such as that before us, where the transcript is an English translation of a foreign language conversation. Such a procedure does not tie a defendant to an 'official' transcript prepared by the prosecution, nor does it 'usurp' the factfinder's function. If there is a dispute as to the contents of a foreign language recording the burden will lie with the respective parties to present transcripts or other evidence to support their version of the conversation."

*Llinas,* 603 F.2d at 509–10. *See also United States v. Rosenthal,* 793 F.2d 1214, 1237 (11th Cir.1986), *cert. denied,* —— U.S. ——, 107 S.Ct. 1377, 94 L.Ed.2d 692 (1987). In our view, the Fifth Circuit's procedure for resolving challenges to the accuracy of a transcript provided to the jury is appropriate. The procedure encourages the production of a stipulated transcript; and if that fails, it leaves the opportunity for either side to present its version of the disputed portion of the transcript to the jury. This procedure is not only desirable, but we believe it is the obligation of well-prepared defense counsel to attempt to facilitate the presentation of evidence and to see that true justice is rendered by attempting to work out an agreed transcript when they question the accuracy of the government's version or fail to present their own translations. In the case at hand, while the defendants did in fact challenge the accuracy of the government's translation of the tapes, the record discloses that they neither attempted to work out an agreed transcript nor presented one of their own. Hence, the transcripts were properly provided to the jury as an aid while listening to the tape-recorded evidence.

 The defendants next challenge the accuracy of the Spanish-to-English translation contained in the transcripts. During Zambrana's case-in-chief, the defendant presented the expert testimony of Maria Medina Seidner, manager of bilingual education for the State of Illinois' Board of Education, in an attempt to demonstrate to the jury the alleged inaccuracies in the translated transcripts. For instance, on direct examination, Ms. Seidner testified that there were translation errors in the government's transcript:

"Q: What are your observations as to Exhibit 101–T? (A government-prepared transcript)

A: I found that there were a lot of errors here, different kinds, and if I could look—could I refer to my notes? I took notes on them.

Q: O.K. You do not recall what it was?

A: Oh, I know what they are, the types of errors. They were vocabularies that were mistranslated. There were a lot of areas that said unintelligible, but it really was intelligible. There [sic] completely wrong constructions in terms of putting words that weren't there and omitting the words that were there and so, you know—it's difficult. I'm not saying that—they are hard to listen to, and it's—and you have—it's very rapid speech. It's a phone conversation, so you don't get the benefit of looking at a person in the face. You have all kinds of difficulties. I can understand that people would make a mistake in transcribing these."

(Zambrana transcript at 461). Nevertheless, upon cross-examination, Ms. Seidner also verified that the government's translation of key phrases was in many instances often correct. An example is contained in this exchange:

"Q: Where it says: 'Go see if Jesse is (unintelligible). Don't tell him in

front of anyone. If he's alone, just tell him that it's Felipe. If there is someone there, well, tell him in his car.'

A: Yes, that's correct.

Q: Now ma'am I believe you have previously testified that where car is indicated that was incorrect where it's mueble, is that correct?

A: Yes.

Q: But also in the translation they actually use carro which means car, is that correct?

A: That's right. They even used the word (speaking in Spanish) at times.

Q: Which is vehicle, is that correct?

A: Yes.

Q: So you're not testifying here that everywhere in these transcripts where it says car that that is incorrect?

A: Absolutely not."

(Zambrana transcript at 503). Despite Ms. Seidner's testimony on direct examination that some translation errors existed in the transcript, the two government expert witnesses testified that the translations were accurate, see *supra*, note 6, and our review of the record convinces us that the government's transcripts were sufficiently clear, accurate and intelligible to assist the jury in giving them a true picture of the criminal enterprise while listening to the taped Spanish conversations. In our view, a foreign language translation is sufficiently accurate to assist the jury if the translation reasonably conveys the intent or idea of the thought spoken.[13] It is axiomatic that a translation of most foreign languages to English (and vice versa) can never convey precisely and exactly the same idea and intent comprised in the original text,[14] and it is unrealistic to impose an impossible requirement of exactness before allowing a translation to be considered by a jury:

"Tape recordings which are only partially unintelligible are admissible unless those portions are so substantial as to render the recording as a whole untrustworthy. *United States v. Wilson*, 5 Cir., 1978, 578 F.2d 67, 69. The determination as to the trustworthiness of a tape recording is left to the sound discretion of the trial judge. *United States v. Avila*, 5 Cir., 1971, 443 F.2d 792, 795, *cert. denied*, 404 U.S. 944, 92 S.Ct. 295, 30 L.Ed.2d 258. *See also United States v. Wilson, supra*, 578 F.2d at 69; *United States v. Onori*, 5 Cir., 1976, 535 F.2d 938, 946."

*Llinas*, 603 F.2d at 508. Rather than excluding the use of transcripts containing translations of foreign languages to English, it is more properly the function of the finder-of-fact to weigh the evidence presented by the parties as to the accuracy of the proffered translation and to determine the reliability of the translation on the basis of that evidence. *Cf. United States v. Torrez–Flores*, 624 F.2d 776, 781 (7th Cir.1980) (reliability of a translator is an issue of credibility for the trier of fact to resolve); *United States v. Cruz*, 765 F.2d 1020, 1023 n. 4 (11th Cir.1985) (interpretation of a foreign language translation presents a jury question).

In the case at hand, the jury had the opportunity to listen to the tapes and determine the accuracy of the translations in the government-prepared transcripts in light of the thorough cross-examination and testimony of all the witnesses, including the testimony of those witnesses with expertise in language translation, dealing with the accuracy of those transcripts. Because the defendant had ample opportunity

---

**13.** The Random House Dictionary of the English Language 2d Ed. at 2011 defines "translation" as "a rendering of the same ideas in a different language from the original."

**14.** *See generally* Martinet, *Elements of General Linguistics* 27–28, 45–46 (1960) ("the words of one language have no exact equivalents in another") and Chafe, *Meaning and the Structure of Language* 268–77 (1970) (discussing the differences in semantic structure among languages). Also, the *Prologue of Ecclesiasticus* states:

"For the same things uttered in Hebrew, and translated into another tongue, have not the same force in them: and not only these things, but the law itself, and the prophets, and the rest of the books, have no small difference, when they are spoken in their own language."

not only to challenge the accuracy of the government's transcript through cross-examination and expert testimony, but also, if he so desired, to present his own transcript, we hold that the defendant's challenge to the district court's decision to allow the jury to use the government's transcript as an aid to listening to the taped conversations is without merit.

Jesus Zambrana also asserts that the transcripts should not have listed the names of the purported speakers, alleging that the procedure to identify some of the voices was improperly suggestive. "Tape recordings are only admissible if the government can establish, by clear and convincing evidence, that the recordings are 'true, accurate, and authentic recording[s] of the conversation[s], at given time[s], between the parties involved.'" *United States v. Keck*, 773 F.2d 759, 766 (7th Cir. 1985) (quoting *United States v. Faurote*, 749 F.2d 40, 43 (7th Cir.1984)). Specifically, Jesus Zambrana claims that Agent McDaniel's identification of Zambrana's voice on the tape-recorded conversations was tainted when he viewed a transcript listing Jesus Zambrana as the speaker prior to listening to the first tape.

At cross-examination during the government's case-in-chief, McDaniel testified that when he identified Zambrana's voice on the first of approximately 30 tapes, he had viewed a transcript listing, in the margin of the pages, Jesus Zambrana as the speaker prior to listening to that tape:

"Q: Would you explain to the ladies and gentlemen of the jury the procedure you went through when you listened to the tape and you reviewed the documents?

A: O.K. I looked at the documents and then Mr. Vega played the tapes and I identified the voices on the tape.

Q: So you looked at the documents first?

A: Well, just on the first one. Then he played the tape and asked me who he was and I looked at the document back and forth.

Q: And you continued with that procedure?

A: Yes.

Q: When you looked at the document, then you heard the tape?

A: Yes.

Q: But you always looked at the document first?

A: No.

Q: Some times you heard the tape first?

A: Yes.

Q: Do you recall the circumstances or the number of the exhibits where you heard the tape before you saw the document?

A: I don't understand.

Q: Do you recall which tapes—well, there are names on these documents, is that correct?

A: Yes.

Q: And they were already there before you reviewed them?

A: Yes.

Q: Were you even played the tapes and just asked—strike that. When you reviewed the documents here they had those names on there, didn't they?

A: Yes.

Q: And then you listened to the tape that corresponded to that document, is that right?

A: Yes."

(Zambrana transcript 319–20). On redirect examination, McDaniel emphasized that with respect to all but the first of approximately 30 tapes, he listened to the tapes *before* looking at the transcripts. Furthermore, McDaniel recounted under oath that he had not only spoken with Zambrana a number of times in person, but also 20 to 30 times over the telephone, and thus was very familiar with the characteristics (e.g., the tone, depth, pitch, inflections, and pauses, etc.) of Jesus Zambrana's voice. Based upon his statements that he was familiar with the traits of Zambrana's voice, he testified that there was no doubt in his mind that his identification of Jesus Zam-

brana as one of the speakers on the tapes was correct.

Because of Agent McDaniel's stated familiarity with Jesus Zambrana's voice characteristics, Agent McDaniel's identification of Jesus Zambrana is not susceptible to meaningful challenge even though he viewed a transcript listing the speaker's name in the margin before listening to the first of approximately 30 tapes. After a review of the record and testimony in this case, we are convinced that where Agent McDaniel: (1) followed a non-suggestive, neutral procedure for identifying the bulk of the tapes, and (2) demonstrated a true familiarity with the tone, quality, and inflections that distinguished Jesus Zambrana's voice based upon his recollection of past conversations with Zambrana, the mechanical problem involving the first tape does not constitute reversible error. As we stated in *United States v. Faurote*, "[t]he trial judge's ruling on the admissibility of the tape will not be overturned on appeal absent 'extraordinary circumstances.'" 749 F.2d at 43. Moreover, because "[t]he trial judge [is] in the best position to weigh the credibility of the parties and the evidence presented," *id.* at 44, "the trial judge exercises broad discretion in determining whether [the government's] burden has been satisfied." *Id.* at 43. In light of Agent McDaniel's testimony that he could recognize the characteristics of Jesus Zambrana's voice and his positive identification of that voice on each of approximately 30 tapes, we agree with the trial judge's assessment that Agent McDaniel's testimony established "that the recordings are 'true, accurate, and authentic recording[s] of the conversation[s], at given time[s], between the parties involved.'" *Keck*, 773 F.2d at 766 (quoting *Faurote*, 749 F.2d at 43). Considering the entire record, we hold that in the fact situation presented, no "extraordinary circumstances" exist to justify disturbing the trial judge's reception of the tapes in evidence.

Finally, the defendants maintain that the district court abused its discretion in permitting the jury to use the transcripts merely as an aid while listening to the tapes that contained the names of the purported speakers. Because the district court utilized the transcripts in substantially the same manner we approved in *Keck, supra,* and *U.S. v. Papia,* 560 F.2d 827, 844 (7th Cir.1977), their argument falls wide of the mark. In *Keck,* we stated that:

> "... this court cannot find that the district court abused its discretion in permitting the jury to use transcripts that contained the names of the purported speakers in the margins. The Government here made the tapes available to defendants prior to trial. The court did not admit the transcripts into evidence and did not furnish them to the jury during its deliberations. Finally, the judge carefully instructed the jury on numerous occasions that it could not consider the transcripts and the names as evidence. These factors, coupled with the fact that the identification of the speakers in the margins served to assist the jury in following the tape recordings, lead us to conclude that the court did not abuse its discretion in allowing the jury to use the transcripts."

773 F.2d at 766. Likewise, the government in this case provided defense counsel with copies of the tapes for their perusal and review 12 days prior to trial. Further, as the court mandated in *Keck,* the district court neither allowed the reception of the transcripts into evidence nor allowed the jury to view or use them during its deliberations. Furthermore, the judge carefully and specifically instructed the jury that it could not consider the transcripts and the names of purported speakers listed therein as substantive evidence. *See Keck,* 773 F.2d at 766. Accordingly, as we held in *Keck,* we hold that "[t]hese factors, coupled with the fact that the identification of the speakers in the margins served to assist the jury in following the tape recordings, lead us to conclude that the court did not abuse its discretion in allowing the jury to use the transcripts." *Id.*

V

Defendants/appellants Jesus Zambrana and Charles Cole both claim that the government's failure to timely disclose ex-

**1340**

culpatory evidence in its possession violated the dictates of *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) and *United States v. Agurs,* 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976), and unfairly prejudiced their ability to defend themselves at trial. Zambrana argues that the government withheld the statement of Andre Sanchez, an alleged co-conspirator, until just prior to the commencement of the introduction of the evidence at trial. In this statement, Sanchez recites that he never dealt directly with Jesus Zambrana when he bought and sold drugs, but instead dealt only with Jay. Jesus Zambrana argues that the government's late disclosure of Sanchez's statement prevented defense counsel from adequately utilizing this statement to establish Jesus Zambrana's lack of involvement in the conspiracy.

■■■ To the extent Sanchez's statement might tend to establish that Jesus was not a "participant" in the conspiracy to deliver cocaine from Florida to Indiana with the intent to distribute, the statement is of some importance to his defense. In *Pinkerton v. United States,* 328 U.S. 640, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946), the court held that an individual demonstrated to be a participant in a conspiracy is liable for the substantive offenses committed by a co-conspirator during the course of the conspiracy. This court has stated that:

> "[u]nder *Pinkerton,* '[o]nce the conspiracy and the defendant's knowing participation in it have been established beyond a reasonable doubt, the defendant will be *vicariously* liable for the substantive acts committed in furtherance of the conspiracy by his co-conspirators.'"

*United States v. Covelli,* 738 F.2d 847, 858 (7th Cir.), *cert. denied,* 469 U.S. 867, 105 S.Ct. 211, 83 L.Ed.2d 141 (1984) (quoting *United States v. Sampol,* 636 F.2d 621, 676 (D.C.Cir.1980) (emphasis added)). Because Sanchez's statement that he never dealt directly with Jesus when he bought and sold drugs is "material" to the issue of his participation in the conspiracy and thus the defendant's guilt, he was entitled to that statement under *Brady.*

■■■ The Supreme Court in *Brady* held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment...." 373 U.S. at 87, 83 S.Ct. at 1196–97. Nevertheless, our Circuit "has made it clear that '[t]here is nothing in *Brady* or *Agurs* to require that such disclosures be made before trial....'" *United States v. Allain,* 671 F.2d 248, 255 (7th Cir.1982) (quoting *United States v. McPartlin,* 595 F.2d 1321, 1346 (7th Cir.), *cert. denied,* 444 U.S. 833, 100 S.Ct. 65, 62 L.Ed.2d 43 (1979)). *See also Kompare v. Stein,* 801 F.2d 883 (7th Cir.1986). In *Allain,* we stated:

> "[t]he standard to be applied in determining whether the delay in disclosure violates due process is whether the delay prevented defendant from receiving a fair trial.... 'As long as ultimate disclosure is made before it is too late for the defendant [ ] to make use of any benefits of the evidence, Due Process is satisfied.'"

671 F.2d at 255 (citation omitted) (quoting *United States v. Ziperstein,* 601 F.2d 281, 291 (7th Cir.1979), *cert. denied,* 444 U.S. 1031, 100 S.Ct. 701, 62 L.Ed.2d 667 (1980)). In this case, the government disclosed Sanchez's statement immediately prior to the commencement of trial and two days before Sanchez testified. Furthermore, Zambrana had three attorneys at his disposal, and his lead counsel vigorously cross-examined Sanchez about the subject matter of Sanchez's statement. Thus, any arguable delay by the prosecutor in disclosing Sanchez's statement was not troublesome and is of no consequence as it did not preclude counsel for the defense from making full use of the evidence during his cross-examination of Sanchez. Because the court record fails to reflect that the delay in disclosing the statement resulted in prejudice to Zambrana's defense, it did not prevent Zambrana from receiving a fair trial, and hence, does not amount to a violation of due process under *Brady.*

Defendant/appellant Charles Cole asserts that his *Brady* rights were trampled

upon when the Lake County, Indiana, police department mistakenly released the automobile that he claims contained his resumes and other job search material.[15] The government concedes that the alleged existence of this material might have been important to Cole's defense since Cole claimed at trial that his trip to Florida was for the sole purpose of gaining employment. But the defendant concedes that the government did not intend to destroy the purported evidence and therefore does not allege bad faith and that there is no evidence that the release of the automobile was anything other than a mistake.

The government argues that the defendant's concession that there is a lack of evidence in the record of government bad faith prevents the extension of the *Brady* rule to this case. This circuit, in an analogous situation, addressed the same issue. In *United States v. Coe,* 718 F.2d 830 (7th Cir.1983), the government's mishandling of a firearm led to the destruction of possible fingerprint evidence. The defendant argued that the *Brady* principle warranted the sanction of mistrial due to the government's alleged destruction or loss of potentially material evidence.

The defendant relied upon *United States v. Bryant,* 439 F.2d 642 (D.C.Cir.1971) where the court reasoned that *Brady* must apply to the loss of non-disclosed evidence of unknown content to prevent the government from circumventing the *Brady* guidelines by destroying evidence. 439 F.2d at 647–48. *Coe* rejected the defendant's argument, holding the *Bryant* analysis inapplicable on the ground that there was "at very least a hint of bad faith" on the officer's part in *Bryant.* 718 F.2d at 841. The court distinguished *Bryant* as follows:

"First, *Bryant* involved a tape recording of a drug transaction that the government later lost. The government chose to make the recording, had the benefit of

listening to it, then deprived the defense of the same opportunity by intentionally taking no steps to preserve it.... In the instant case, neither party had the benefit of the fingerprint analysis. This case would be more closely analogous to *Bryant* if the government had analyzed the gun for fingerprints, reviewed the report, then intentionally failed to preserve the report for the defense.

Second, the *Bryant* Court prefaced its analysis by stating:

'It is important to recognize that this is not a case of good faith effort to preserve highly relevant evidence, frustrated only by inadvertent loss. Rather, it is a case of intentional non-preservation by an investigative official.... At issue, then, are the legal consequences of intentional non-preservation by investigative officials of highly relevant evidence, colored by clear reluctance even to admit that the evidence ever existed at all.'

The [*Bryant*] court found it significant that loss of the evidence was accompanied by 'at very least a hint of bad faith,' holding that the circumstances of the loss are relevant to the question of proper sanctions...."

718 F.2d at 841 (quoting *Bryant,* 439 F.2d at 647) (citations omitted). *Coe* concluded that because "there is no indication that the arresting officer who confiscated the gun was not acting in good faith or that he intended to destroy the potential fingerprint evidence," the sanction of mistrial was not warranted. *Id.*

In *California v. Trombetta,* 467 U.S. 479, 104 S.Ct. 2528, 81 L.Ed.2d 413 (1984), the Supreme Court agreed that the loss or destruction of evidence does not implicate the Due Process Clause of the Fourteenth Amendment absent "official animus" or a "conscious effort to suppress exculpatory

---

**15.** In addition to copies of his resume, Cole testified that his suitcase contained a folder with materials that he had received from a job training program about looking for a job. The suitcase also allegedly contained a Georgia newspaper and one or more Florida newspapers, including the classified advertisement for job openings, some of which defense counsel states

"may have been circled or otherwise marked, thus tending to show that his purpose for accompanying Ernest Lonzo to Florida was to job hunt." (Defendant/appellant Cole's brief, at p. 11.) Further, counsel asserts that "[a]lso thrown away may have been Mr. Cole's handwritten notes regarding prospective employers and places of employment." *Id.*

evidence." 467 U.S. at 488, 104 S.Ct. at 2533. In addition to the bad faith element, the Court held that the destroyed evidence must be "material" to the suspect's defense under this two-part test:

"Whatever duty the Constitution imposes on the States to preserve evidence, that duty must be limited to evidence that might be expected to play a significant role in the suspect's defense. To meet this standard of constitutional materiality, see *United States v. Agurs,* 427 U.S., at 109–110 [96 S.Ct., at 2400–2401] *evidence must both possess an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means.*"

*Id.* 467 U.S. at 488–89, 104 S.Ct. at 2534. (Emphasis added).

In *Trombetta,* the defendants, charged with drunk driving, moved to suppress the results of an "Intoxilyzer" test used to determine a person's blood-alcohol content on the ground that police officers did not preserve their breath samples. Defendants asserted that they could have used the samples at trial to impeach the Intoxilyzer test results. The Supreme Court rejected the defendants' argument, holding that the police had not destroyed the breath samples "in a calculated effort to circumvent the disclosure requirements established by *Brady v. Maryland* and its progeny." *Id.* at 488, 104 S.Ct. at 2534. Additionally, the Court held that the destroyed evidence failed both prongs of the test of materiality since: (1) the general reliability of the test made it improbable that the breath samples would have been exculpatory; and (2) the defendants could have obtained comparable evidence (for example, the Court noted that data on possible sources of mechanical error could have been used to impeach the Intoxilyzer's reliability, and the defendants retained "the right to cross-examine the law enforcement officer who administered the Intoxilyzer test, and to attempt to raise doubts in the mind of the fact-finder whether the test was properly administered.") *Id.* at 490, 104 S.Ct. at 2535. *See also*

*Elmore v. Foltz,* 768 F.2d 773 (6th Cir. 1985).

Even assuming that Cole satisfied the *Trombetta* standard for materiality, the district court properly analyzed the evidence in light of the "bad faith" standard, and we agree with the court's conclusion that the record contains absolutely no evidence of "official animus" or a "conscious effort to suppress exculpatory evidence." *Id.* 467 U.S. at 488, 104 S.Ct. at 2533. In his argument before the district court on Cole's motion to dismiss the indictment (wherein Cole argued that the government's failure to preserve the potentially exculpatory evidence allegedly located in Cole's luggage warranted dismissal of the indictment), defense counsel admitted that he could not argue the existence of bad faith on the part of the government. Counsel for the defendant stated:

*"We're not contending that the Government has in any way intentionally or in a deliberate sense destroyed the evidence.* We are saying that they took control of the circumstances; they had it under their domain; my defendant attempted to get those items back and could not.

And had he been able to do so he could have used that evidence in this trial. Because the Government took charge and apparently either failed to properly care for it or otherwise dispose of it, that evidence is gone and he's now forever deprived of the ability to use that evidence to exculpate him in this matter, and that is the basis of our motion."

(Cole Tr. at 12) (emphasis added). Next, in its argument on Cole's motion to dismiss, the government stated that both Agent Harris and Lake County, Indiana, Police Officer Longfellow testified in their sworn affidavits that their search of the Oldsmobile shortly after Lonzo's arrest failed to reveal resumes or any other alleged exculpatory material, but that the vehicle contained luggage with items of clothing inside. Although the government readily admitted before the trial judge that the Lake County police inadvertently released the automobile on June 15, 1985, to one Daniel Blount, and upon being informed of the

mistake three days later retrieved it from Mr. Blount, the government argued that the mere mistaken release of the automobile does not justify dismissal of the indictment.

The district court ruled as follows: "THE COURT: The Court, after considering the motion, finds that the defendant's motion to dismiss should be denied. *The indications are that any destruction or loss of items from the vehicle* belonging—loss of items, clothing that belonged to the defendant from the vehicle *were not occasioned by the Law Enforcement agencies involved in the arrest and seizure of the vehicle.*

However, the matter with regard to the presence of such items and what may have been contained are subject to cross examination of Government witnesses who take the stand and indicate what was located.

Nevertheless, the sanction of dismissal the Court feels is not appropriate under the circumstances indicated by the facts in this case. Therefore, the motion to dismiss for destruction of evidence is overruled and denied."

(Cole Tr. at 13) (emphasis added). Given defense counsel's admission that the release of the automobile was not the result of government bad faith and the government agents' sworn testimony that their search of the vehicle shortly after the defendant's apprehension failed to reveal that the alleged exculpatory evidence existed, we are persuaded that the district court's decision is not clearly erroneous. Although defense counsel asserts that the government was in control of the evidence and failed to preserve it properly, this alone is insufficient to establish bad faith. Our review of the record convinces us that there is absolutely no evidence that the government's regular procedures are inadequate, or that government agents intentionally destroyed evidence. Thus, the inadvertent release of the automobile and the possible destruction of alleged exculpatory evidence does not infringe upon Cole's due process rights under *Brady.*

## VI

Each of the defendants-appellants argue that the trial court erred in admitting the taped conversations between co-conspirators without requiring the government to offer substantial evidence independent of the statements themselves to link the defendants-appellants to the conspiracy. In each defendant's trial, the court admitted these conversations as substantive evidence under the so-called "co-conspirator exception" to the rule against hearsay testimony. Fed.R.Evid. 801(d)(2)(E). Under this rule, a statement is not hearsay if "the statement is offered against a party and is ... a statement by a co-conspirator of a party during the course and in furtherance of the conspiracy." *Id.*

The defendants argue that it was error for the district court to admit the tape-recorded conversations among the co-conspirators since the government failed to establish by a preponderance of evidence *independent of the statements themselves* that they were members of the conspiracy charged by the government. Their legal argument—that the defendants' membership in the conspiracy must be demonstrated through the introduction of *independent evidence*—finds support within this Circuit. The defendants cite the most important of these cases, *United States v. Santiago,* 582 F.2d 1128 (7th Cir.1978), which held that a hearsay statement is admissible under Rule 801(d)(2)(E) "only when the government has established by a preponderance of the evidence, independent of the statement itself, that (1) a conspiracy existed, (2) that defendants and the declarant were members of the conspiracy, and (3) that the statement was made in the course of the conspiracy." *United States v. Xheka,* 704 F.2d 974, 985 (7th Cir.), *cert. denied,* 464 U.S. 993, 104 S.Ct. 486, 78 L.Ed.2d 682 (1983). But once the conspiracy is established, "only slight evidence is required to link a defendant to it." *United States v. Shoffner,* 826 F.2d 619, 627 (7th Cir.), *cert. denied sub nom. Strange v. United States,* —— U.S. ——, 108 S.Ct. 356, 98 L.Ed.2d 381 (1987) (quoting *United States v. Garver,* 809 F.2d 1291, 1295 (7th Cir.1987)).

Following the oral argument in this case, the Supreme Court ruled contrary to our Circuit's (and others') former precept that the admissibility of a co-conspirator statement must be established solely through the introduction of independent evidence. In *Bourjaily v. United States*, —— U.S. ——, 107 S.Ct. 2775, 97 L.Ed.2d 144 (1987), the Court ruled that trial courts may consider the content of the statement itself when determining the admissibility of a statement under Rule 801(d)(2)(E). Before *Bourjaily*, this Circuit had interpreted prior Supreme Court decisions to require that the existence of and membership in the conspiracy be proven through evidence independent of the declaration itself, "lest inadmissible hearsay bootstrap itself into admissibility." *Shoffner*, 826 F.2d at 627 n. 12. For instance, in *Glasser v. United States*, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942), the Supreme Court had stated:

> "[s]uch declarations are admissible over the objection of an alleged co-conspirator, who was not present when they were made, only if there is proof *aliunde* that he is connected with the conspiracy.... Otherwise, hearsay would lift itself by its own bootstraps to the level of competent evidence."

315 U.S. at 74–75, 62 S.Ct. at 467 (citations omitted). Rejecting a *per se* rule precluding the use of hearsay statements when determining their admissibility, *Bourjaily* reasoned that the Federal Rules of Evidence superseded earlier cases such as *Glasser:*

> "Rule 104(a) provides: 'Preliminary questions concerning ... the admissibility of evidence shall be determined by the Court.... In making its determination it is not bound by the rules of evidence except those with respect to the privileges.' Similarly, Rule 1101(d)(1) states that the Rules of Evidence (other than with respect to privileges) shall not apply to '[t]he determination of questions of fact preliminary to admissibility of evidence when the issue is to be determined by the Court under Rule 104.' ... Congress has decided that courts may consider hearsay in making these factual determinations. Out-of-court statements

made by anyone, including putative co-conspirators, are often hearsay. Even if they are, they may be considered, *Glasser* and the bootstrapping rule notwithstanding....

> ... Rule [104] on its face allows the trial judge to consider any evidence whatsoever, bound only by the rules of privilege. We think that the rule is sufficiently clear that to the extent that it is inconsistent with petitioner's interpretation of *Glasser* and *Nixon*, the Rule prevails."

107 S.Ct. at 2780.

Thus, the Court held: "it is sufficient for today to hold that a court, in making a preliminary factual determination under Rule 801(d)(2)(E), may examine the hearsay statements sought to be admitted. As we have held in other cases concerning admissibility determinations, the judge should receive the evidence and give it such weight as his judgment and experience counsel." 107 S.Ct. at 2782.

In rejecting a *per se* rule against considering these statements when ruling on their admissibility, the Court reasoned that presumptively unreliable hearsay may become probative if the statements are considered in light of other evidence in the case. Chief Justice Rehnquist, writing for the Court in *Bourjaily*, explained:

> "*First, out-of-court statements are only presumed unreliable. The presumption may be rebutted by appropriate proof.... Second, individual pieces of evidence, insufficient in themselves to prove a point, may in accumulation prove it.... Taken together, these two propositions demonstrate that a piece of evidence, unreliable in isolation, may become quite probative when corroborated by other evidence.* A per se rule barring consideration of these hearsay statements during preliminary fact-finding is not therefore required. Even if out-of-court declarations by co-conspirators are presumptively unreliable, trial courts must be permitted to evaluate these statements for their evidentiary worth as revealed by the particular circumstances of the case. Courts often act as fact-finders, and there is no reason

to believe that courts are any less able to properly recognize the probative value of evidence in this particular area."

107 S.Ct. at 2781 (emphasis added). As the italicized segment of the above excerpt demonstrates, the heart of the Chief Justice's reasoning is that while "out-of-court statements are only *presumed* unreliable," they may nevertheless "become quite probative when corroborated by *other evidence*," *Id.* at 2781, and therefore may be considered along with the other evidence in ruling on the admissibility of the hearsay statement.

The facts of *Bourjaily* are instructive of the current test under Rule 801(d)(2)(E). In that case, the out-of-court statements of the petitioner-defendant indicated that one Lenardo (an alleged co-conspirator) was involved in a conspiracy with a "friend." The statements indicated that the friend had agreed with Lenardo to buy a kilogram of cocaine and to distribute it. His statements also revealed that the friend would be at the hotel parking lot, in his car, and would accept the cocaine from a government informant's (Greathouse) car, after Greathouse gave Lenardo the keys. The Supreme Court noted that each one of Lenardo's statements may have been unreliable, but taken as a whole, the entire conversation between Lenardo and Greathouse was corroborated by independent evidence. The friend, who turned out to be the petitioner, showed up at the prearranged spot at the prearranged time. He picked up the cocaine and a significant sum of money was found in his car. Based upon these facts, the trial court concluded (correctly in the Supreme Court's view) that the government had established the existence of the conspiracy and the petitioner's participation in it, and that the court properly admitted the challenged statements under Rule 801(d)(2)(E).

As in *Bourjaily*, evidence other than the hearsay statements themselves substantiate the statements proffered against the co-conspirators. For instance, in a taped conversation on April 20, 1985, between Jay Zambrana and co-defendant Antonio Dominguez, Jay told Dominguez that the car was available and that it was ready to leave with "the two who went the last time, the two black guys" (allegedly Lonzo and the defendant-appellant Charles Cole). Dominguez stated that the paint was "soft" and "metallic," apparently referring to the quality of the cocaine to be shipped to the Zambranas in Indiana. Thereafter several telephone conversations between Zambrana, Jay, Dominguez, and co-defendant Roberto Rodriguez on April 21, 1985, were intercepted concerning whether the "boys" had left and why they were delayed in their arrival. Zambrana informed Dominguez in cryptic language: "The plane flight is a bit late because it seems the road was messed up" and "They told me they lost about three or four hours." The government argued that these phrases pertained to Lonzo and Cole's delay in delivering the cocaine to the Zambrana residence.

At trial, the government also introduced taped conversations that had taken place on April 22, 1985, between Jesus Zambrana and co-defendant Dominguez three days before Lonzo's car was stopped by the Lake County police on I-65. In that conversation, Dominguez stated that Lonzo and Cole were lost about 45 minutes from where they were to meet Dominguez in Miami Beach. Dominguez arranged for a three-way conversation, and Zambrana gave Cole and Lonzo directions to Miami Beach. The following day, Dominguez called Jesus and told him that he had found a car with the "prettiest metallic paint" he had ever seen but that the price had gone up and consequently, Zambrana had to go up in price "$1.00 per car." The government argued at trial that this expression was used by the co-conspirators to refer to the quality and price of the drugs.

On April 25, 1985, at 3:10 p.m., Dominguez informed Jay that he had sent his "six uncles" and "had placed a note in one of his uncle's pockets," which the government asserted alluded to the six bags of cocaine recovered from the vehicle driven by Lonzo from Florida later on the 25th, as well as a note recovered from one of the bags. Shortly thereafter, at 6:33 p.m., Lonzo called the Zambrana residence seeking Jay to inform him that they "were ten miles

out of Lafayette" and would arrive around 10 p.m. On the basis of these phone conversations, the DEA set up surveillance on I-65 and at about 9 p.m. Officer Downs apprehended Lonzo and Cole, along with the automobile containing six bags of cocaine.

Because these conversations, which implicated the defendants-appellants in the drug operation, were corroborated by independent evidence—the seizure of cocaine contained in Lonzo's automobile immediately following the April 25 conversations—the trial court was permitted to consider the content of the statements, along with other evidence in the case, in determining each defendant's participation in the conspiracy. In *U.S. v. Xheka*, 704 F.2d at 988–89, we explained that a defendant's:

> "[p]articipation in a criminal conspiracy may be shown through circumstantial evidence. Circumstantial evidence may include whether the defendant has a stake in the outcome of the conspiracy. Once a conspiracy is shown to exist evidence that establishes a particular defendant's participation beyond a reasonable doubt, although the connection between defendant and conspiracy is slight, is sufficient to convict. Most important to this case is the well-established rule that mere association, knowledge or approval of a conspiracy is not sufficient to prove a defendant's guilt. However, while 'mere presence at the scene of the crime or mere association with conspirators will not themselves support a conspiracy conviction ... presence or a single act will suffice if the circumstances permit the inference that the presence or act was intended to advance the ends of the conspiracy.'"

(Citations omitted). We are convinced that the government established, by a preponderance of the direct and circumstantial evidence, including but not limited to the hearsay declarations themselves, each defendant's participation in the conspiracy. First, the content of the telephone conversations between Jesus and Jay Zambrana and the other co-conspirators provided direct evidence tying them to the attempted delivery of cocaine on April 25. Although the word "cocaine" was never referred to in any of the conversations, the trial judge could properly have accepted the government's contention that phrases such as "metallic paint" were used as code words to allude to the illegal drugs. And as mentioned previously, this interpretation of the conversations was verified by the April 25 seizure of cocaine contained in Lonzo's automobile. The evidence thus permits the conclusion that the Zambrana family made several telephone calls to Dominguez's phone in Miami to organize trips to purchase and pick up cocaine. Secondly, the evidence, including but not limited to the taped conversations, was also sufficient to demonstrate Cole's participation in the conspiracy. While Cole's mere association with the other conspirators is insufficient in itself to establish that he knowingly participated in the illegal purpose of the trip from Florida to Indiana, *Covelli*, 738 F.2d at 861, the circumstances surrounding the defendant's actions support such an inference. "Presence has been sufficient evidence of knowing participation in a conspiracy when there were suspicious circumstances, and the existence of the conspiracy was already established." *Id.* Not only was Cole present during the entire process of picking up and delivering the cocaine, but Cole was also present when Lonzo telephoned Jay to receive directions as to where to pick up the cocaine from Dominguez. Furthermore, the trial judge could properly consider the implausibility of Cole's own testimony that: (1) he could not remember the names of any persons he talked to in Florida about locating a job; (2) he could not remember the name of any one business where he had allegedly left his resume; (3) he didn't know which cities they were going to or where or how long they would stay; and (4) Lonzo asked Cole to go to Florida with him only about two hours before they actually departed. In sum, the content of the taped phone conversations, the circumstances of the pickup and delivery of the cocaine, and the implausibility of Cole's testimony, establish a sufficient basis for the trial judge's finding that Cole and the other defendants were knowing participants in the conspiracy.

Thus, the trial court properly admitted the tape recordings against each of the defendants under Rule 801(d)(2)(E).[16]

In reaching our decision affirming the trial court, we note that all too often, as we are seeing in this case, the defense counsel takes a buckshot approach, hoping a pellet will strike. But the Supreme Court has "repeatedly stated, 'the Constitution entitles a criminal defendant to a fair trial, not a perfect one.'" *Rose v. Clark*, 478 U.S. 570, 106 S.Ct. 3101, 3107, 92 L.Ed.2d 460 (1986) (quoting *Delaware v. VanArsdall*, 475 U.S. 673, 106 S.Ct. 1431, 1436, 89 L.Ed.2d 674 (1986)). Our review of the record makes it eminently clear that each of the defendants received the fair trial to which he is entitled under the Constitution.

WE AFFIRM.

---

**16.** Defendants-appellants also argue that the trial court's admission of approximately 5,847.10 grams of cocaine into evidence unfairly prejudiced their defense. Since the amount and street value of the cocaine (approximately $2 million) was highly relevant to the issue of the defendants' intent to distribute, we hold that the district court did not abuse its discretion when it admitted the cocaine into evidence. *See U.S. v. DiNovo*, 523 F.2d 197, 202 (7th Cir.), *cert. denied*, 423 U.S. 1016, 96 S.Ct. 449, 46 L.Ed.2d 387 (1975) ("any 'prejudice' was due only to the fact of the amount of heroin possessed which was the very subject of the crime charged.").

Additionally, defendants-appellants argue that the trial court erred in admitting into evidence testimony from Donald R. McDaniel that on three occasions prior to the time set forth in the indictment, Zambrana provided McDaniel with cocaine. McDaniel's testimony was admitted pursuant to Fed.R.Evid. 404(b). Although evidence of "other bad acts" on the defendant's part are not admissible to demonstrate the defendant's propensity to commit the offense charged, defendant's prior cocaine sales are relevant to the issue of his intent to distribute cocaine, *U.S. v. Shackleford*, 738 F.2d 776, 781 (7th Cir.1984), and are therefore admissible under Rule 404(b).