**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Randolph THOMPSON, Terrius Wynn, Alcus Todd Thompson, and Donovan Dawes, Defendants–Appellants.**

Nos. 90–1305, 90–1390, 90–1391 and 90–2343.

United States Court of Appeals, Seventh Circuit.

Argued April 3, 1991.
Decided Sept. 18, 1991.

R. Jeffrey Wagner and Joseph R. Wall, Asst. U.S. Attys. (argued), Office of U.S. Atty., Milwaukee, Wis., for plaintiff-appellee.

David Lenefsky (argued), New York City, for defendant-appellant Randolph D. Thompson.

Thomas G. Halloran (argued), Milwaukee, Wis., for defendant-appellant Terrius Wynn.

Frederick F. Cohn (argued), Chicago, Ill., Gerald P. Boyle, Milwaukee, Wis., for defendant-appellant Alcus T. Thompson.

Paul Lazarus (argued), Bierman, Shohat & Loewy, Miami, Fla., for defendant-appellant Donovan Dawes.

Before FLAUM and RIPPLE, Circuit Judges, and MOODY, District Judge.[*]

FLAUM, Circuit Judge.

The convictions appealed in this case were the product of an investigation that centered on the drug trafficking activities of Todd Thompson. Assisted by co-defendant Terry Wynn and others, Thompson purchased cocaine from several sources in Los Angeles, including his cousin and co-defendant Randy Thompson and co-defendant Donovan Dawes, and distributed it from his home in Milwaukee. The appellants, along with several others, were indicted for conspiring to possess and distribute cocaine. Thompson and Dawes, along with Tony Weathers, a co-conspirator who pled guilty and testified at trial, were indicted in six counts for violating the Travel Act, 18 U.S.C. § 1952, by sponsoring the interstate travel of Chris Guddie and Jennifer Bailey, whom they employed as couriers to transport cash and cocaine between Milwaukee and Los Angeles. The same trio was charged with constructive possession of the four kilograms of cocaine Bailey was carrying when she was arrested on the return leg of a trip to Los Angeles in February 1989 and the two kilograms Guddie had with her when she was arrested after a trip in May 1989. The indictment also included five counts charging violations of 21 U.S.C. § 843(b) by using the telephone to facilitate drug offenses. Todd Thompson was named in each of these counts, and Dawes in three of them. In the final count of the indictment, Todd Thompson was charged with possessing a firearm in connection with a drug trafficking offense in violation of 18 U.S.C. § 924(c).

The appellants raise a host of challenges to their convictions. Donovan Dawes, along with Tony Weathers, Bailey, Guddie, and a number of others with whom Todd Thompson conducted drug-related business pled guilty to the charges against them. Dawes conditioned his plea, however, on his right to appeal denials of motions to suppress evidence and to dismiss the indictment. He maintains that the wiretap of Todd Thompson's home failed to satisfy statutory prerequisites of the federal electronic surveillance statute, 18 U.S.C. § 2518, and sought to suppress the evidence garnered from the wiretap (he also challenges the government's refusal to provide him with copies of all of the recordings it made by means of the tap). Dawes also seeks dismissal of the indictments against him, alleging that the government continued to use the grand jury as a means of collecting evidence against him even after he had been indicted. Randy Thompson and Terry Wynn both contest the sufficiency of the evidence supporting their conspiracy convictions, and each raises a number of individual issues as well. Randy claims that the district court erroneously failed to

[*] The Honorable James T. Moody, United States District Judge for the Northern District of Indiana, is sitting by designation.

give necessary jury instructions and failed to inquire whether his waiver of his right to testify was made knowingly and intelligently. He also contests the district court's finding at sentencing that he warranted an enhancement under § 3B1.1 of the Sentencing Guidelines for being a supervisor of criminal activity; Todd Thompson appeals the enhancement he received under § 3B1.1 as an organizer of criminal activity. In addition to c the sufficiency of the evidence that he conspired to distribute cocaine, Wynn asserts that the district court based his sentence on drug trafficking activity not fairly attributable to him. Along with Todd Thompson, he also claims that he was unfairly prejudiced at trial when the district court revoked bail for the defendants near the close of the government's case. Wynn and Todd Thompson also object to the enhancement of their sentences for obstruction of justice. And finally, Todd Thompson appeals the consecutive five-year sentence he received for his firearms conviction, claiming that it violates the eighth amendment's prohibition of cruel and unusual punishment. We affirm the appellants' convictions and the sentences of Todd Thompson and Donovan Dawes, but vacate and remand the sentences of Randy Thompson and Terry Wynn.

## I. Post–Indictment Use of the Grand Jury

■ Unlike his co-defendants, Donovan Dawes entered a plea agreement to the conspiracy charge conditioned on his right to appeal the district court's denial of his motions to suppress evidence and to dismiss the indictment. Dawes premised the motion to dismiss on his view that the government had abused the grand jury process by calling witnesses against him after he had already been indicted by the grand jury. "Once a defendant has been indicted, the government is precluded from using the grand jury for the 'sole or dominant purpose' of obtaining additional evidence against him." *United States v. Moss*, 756 F.2d 329, 332 (4th Cir.1985); *see also United States v. Scott*, 784 F.2d 787, 792 (7th Cir.), *cert. denied*, 476 U.S. 1145, 106 S.Ct. 2257, 90 L.Ed.2d 702 (1986). Dawes maintains that the government effectively used the grand jury, rather than the procedures required by the Federal Rules of Criminal Procedure, to conduct discovery into the charges already pending against him when it subpoenaed Jennifer Bailey and Kristina McHenry to testify before the grand jury. The government maintains that these witnesses were called before the grand jury as part of a continuing investigation into the activities of the conspiracy designed to uncover evidence of crimes not contained in the indictment.

■ The burden is on Dawes to show that the government's purpose was primarily to collect evidence relating to pending charges. *Moss*, 756 F.2d at 332. He has clearly failed to meet that burden with regard to McHenry's testimony. McHenry was a friend of Artaynia Demps, a woman who lived with Todd Thompson during much of the period Thompson was distributing cocaine. The prosecutors questioned her about her involvement with many of those associated with Todd Thompson, including Demps, Tony Weathers, Chris Guddie, and Terry Wynn. McHenry also testified about her contacts with Dawes, but the testimony did not relate to any specific acts for which Dawes had been indicted. He maintains that the government's questions went to his involvement with, and knowledge of, the conspiracy; we agree, but cannot say that he has shown that the government's purpose was to gather more evidence to implicate Dawes in the conspiracy rather than to determine whether McHenry could tell them if Dawes had committed any substantive crimes for which he had not yet been indicted. Were we to adopt Dawes' broad view, the government would be unable to return to the grand jury after obtaining a conspiracy indictment no matter how narrowly focused its interrogation; most substantive crimes committed during the course of a conspiracy also serve to further implicate the perpetrator in the conspiracy itself.

■ The questioning of Jennifer Bailey is more problematic. To be sure, Bailey was a witness who might have provided the

government with additional information about substantive crimes committed by Dawes, Randy Thompson, or others, during the course of the conspiracy, so the prosecutors were entitled to bring her before the grand jury even after the indictments against the principal conspirators had issued. Nevertheless, we agree with Dawes' view that much of the Bailey's questioning related to her third trip to Los Angeles in February 1989 when she delivered cash to Dawes and returned to Milwaukee with a suitcase containing four kilograms of cocaine. Dawes had already been indicted for his involvement in these events (Count 5), and it is difficult to credit the government's position that its questions relating to this exchange were asked with an eye toward uncovering evidence of *other* transactions in which Dawes was involved. Consider the questions the Assistant United States Attorney asked concerning the exchange:

AUSA: And do you contact this person known as "D"?

Bailey: Yes.

AUSA: And what happens next?

Bailey: I contact him, I called him. He comes, gets the suitcase. He says he is going to bring me the suitcase back later on that evening. He didn't come back that evening, so I got worried and called Todd and told Todd that he didn't bring the suitcase back, and what was going on and this and that and they said just hold on, he will be there. And the next day he came with it.

AUSA: "D" came back with the suitcase?

Bailey: Right, the next evening.

AUSA: When "D" comes back with the suitcase, he comes to your hotel room?

Bailey: Yes.

AUSA: What does he ask you to do?

Bailey: First he calls and said he would be there in 20 minutes, and it took him about a half hour. When he came, he asked me to leave the room for 20 minutes and I went downstairs. He said go downstairs in the lounge and I

went down in the lounge, and was gone from the room for about an hour.

AUSA: And you come back to your room and is "D" still there?

Bailey: "D" is gone.

AUSA: Is the suitcase there?

Bailey: The suitcase is there.

We do not see how this series of questions was designed to enhance the government's knowledge of anything but Dawes' involvement with, and responsibility for, the cocaine in Bailey's possession when she was arrested upon her return to Milwaukee. Had the government been looking for evidence of other substantive offenses, for example, it seems likely that the prosecutor would have inquired whether Bailey knew anything about Dawes' cocaine source, or the reasons for his delay in obtaining the cocaine. Instead, this line of inquiry was focused on matters that were relevant only to the allegations of Count 5 of the indictment already pending against Dawes. We therefore conclude that the questions were improper, constituting an abuse of the grand jury process.

 Dawes asks us to dismiss the indictment against him on this basis. That remedy would be too broad, however, for the error related only to Count 5 of the indictment. Had Dawes stood trial and been convicted on Count 5, we might well conclude that the abuse of the grand jury process had prejudiced him; so far as the record reveals, Bailey had not provided the government with any information about Dawes' involvement before her grand jury testimony. The government points us to no prior statements, and Bailey herself testified on cross-examination that she had not spoken with federal agents until she appeared before the grand jury:

AUSA: When have you talked to any representatives of the United States Government in regard to this case? Going backwards, have you talked to them today?

Bailey: Today and in August.

 * * * * * *

AUSA: You remember when you talked to them?

Bailey: August 16th.

AUSA: Okay, and when was, why did you talk to them August 16th?

Bailey: Grand jury.

AUSA: Why do you remember August 16th?

Bailey: Because that was the day after I went to court on August 15th for sentencing.

AUSA: So you got sentenced on August 15th?

Bailey: I was supposed to be sentenced on August 15th.

AUSA: And what happened?

Bailey: It was postponed.

\* · \* \* \* \* \*

AUSA: Did you talk to any members of the Drug Enforcement Unit or the FBI on August 15th?

Bailey: No.

AUSA: Did you talk to them on August 16th?

Bailey: Yes.

AUSA: And how did that come about?

Bailey: I was before the Grand Jury.

AUSA: Okay. And how did it come about that you were in front of the Grand Jury?

Bailey: I don't know. I was subpoenaed.

AUSA: You were subpoenaed?

Bailey: Yes.

AUSA: And you had not talked to them prior to that?

Bailey: No.

\* \* \* \* \* \*

AUSA: Have you had conversations after the Grand Jury with members of the FBI and or the Drug Enforcement?

Bailey: No, not to today.

AUSA: So you have not talked to anybody except right before you go into the Grand Jury you testified at the Grand Jury, you are sentenced, now you are back here today?

Bailey: Right.

Would Bailey have cooperated with the government absent the coercion inherent in a grand jury subpoena issued shortly before her own sentencing hearing? Would the government have called her to testify at trial without the benefit of a dry run

before the grand jury? Would the jury have convicted Dawes on Count 5 absent Bailey's testimony? The government would have to address these questions to meet its burden of proving its error harmless beyond reasonable doubt to Dawes' conviction on Count 5. But Dawes wasn't convicted on Count 5. He pled guilty only to Count 1, the conspiracy charge; the remaining charges against him were dropped. Even apart from Bailey's testimony, the evidence linking Dawes to the conspiracy was overwhelming, and he would not have been prejudiced as to that count by Bailey's testimony before the Grand Jury had he gone to trial. We therefore conclude that the government's error does not warrant reversal of Dawes' conspiracy conviction.

II. Motion to Suppress Wiretap Evidence

▆▆▆ Dawes also conditioned his plea on the appeal of his motion to suppress the evidence against him gathered from a wiretap placed on the telephone line to Todd Thompson's home. As an initial matter, we note that Dawes' targeted his motion broadly against the entire wiretap rather than against specific calls to which he was a party. The interception of calls to which he was not a party did not intrude upon Dawes' fourth amendment rights, however, so he has no standing to seek suppression of evidence gathered from those intercepts. *United States v. Gallo*, 863 F.2d 185, 192 (2d Cir.1988), *cert. denied*, 489 U.S. 1083, 109 S.Ct. 1539, 103 L.Ed.2d 843 (1989). The government has inexplicably failed to make this point, however, and has therefore waived any objection to Dawes' standing to ask that we suppress all evidence obtained from the wiretap that is adverse to him. *United States v. Nechy*, 827 F.2d 1161, 1165 (7th Cir.1987).

▆▆▆ Dawes claims that the wiretap was unlawful because the government failed to exploit other, less intrusive, means of investigation available to it. Title III of the Omnibus Crime Control and Safe Streets Act of 1968 (commonly known as "Title III"), 18 U.S.C. §§ 2510 *et seq.*, requires that law enforcement officials demonstrate "that normal investigative procedures have been tried and failed or reasonably appear

to be unlikely to succeed if tried or to be too dangerous." *United States v. Giordano,* 416 U.S. 505, 515, 94 S.Ct. 1820, 1826, 40 L.Ed.2d 341 (1974); 18 U.S.C. § 2518(1)(c), (3)(c). This requirement is commonly known as the "exhaustion" requirement, *United States v. Anderson,* 542 F.2d 428, 430 (7th Cir.1976), but that label is something of a misnomer, as the statute was intended to ensure not that wiretaps are used only as a last resort in an investigation, but that they "were not to be routinely employed as the initial step in criminal investigation." *Giordano,* 416 U.S. at 515, 94 S.Ct. at 1826. To that end, the statute does not require that other investigative procedures actually be implemented before an order may be issued for the interception of wire communications, but only that the success of other methods of investigation appear unlikely. *United States v. Zambrana,* 841 F.2d 1320, 1329 (7th Cir.1988). The need for the wiretap is a judgment we leave largely to the principled discretion of the district court. *Id.* at 1330.

■ In Dawes' view, the DEA failed to exploit adequately its knowledge of, and influence over, several individuals connected to the Thompson conspiracy, specifically Jennifer Bailey, Eugene Chaney, Billy Cannon, and two confidential informants. Dawes asserts that the DEA could have used these individuals to infiltrate the group, but we conclude that the prospect of obtaining further incriminating information from these sources was, at best, slim. Once Bailey had been arrested in possession of four kilograms of cocaine, it seems unlikely that Thompson would have trusted her motives had she returned to him seeking further work (such an approach would have been particularly suspicious in view of the fact that Bailey had never *sought* any work from Thompson at all; he and Weathers recruited her and initiated contact each time they needed her services). Moreover, as the government points out, Bailey did not cooperate with their investigation from the time of her arrest until her appearance before the grand jury (a fact that contributes to our concern, discussed above, about the government's motives for subpoenaing Bailey to testify before the grand jury after obtaining an indictment). Eugene Chaney, who was under indictment on unrelated narcotics charges, gave DEA agents a statement about his drug-related activities, including some related to Thompson's cocaine business. The DEA did not obtain this information until after Chaney had been indicted, however; he was tried and convicted soon after, rendering him unavailable for further use as an undercover informant. Billy Cannon, a drug dealer who was cooperating with the DEA on other matters, denied knowing Todd Thompson at all. The government did have a record of a single phone call from Cannon's apartment to Thompson's residence (the briefs are not clear about whether Cannon was even home at the time the call was made), but there was no other evidence suggesting that Cannon had any sort of relationship with Thompson that the government could exploit. The same holds true for the confidential informants; one did not know Thompson at all, and the other was not closely connected to him, knowing Thompson only as "Townsend." Finally, we note that the government only obtained authorization to tap Thompson's phone in late May, 1989, after it had obtained what information each of these witnesses could provide. The wiretap of Todd Thompson's phone was the culmination, not the initial step, in the investigation.

### III. Motion to Compel Production of Tapes

Dawes also appeals the denial of his motion to compel the government to provide him with copies of all of the conversations recorded through the wiretap. The United States Attorney's Office did supply the defendant with copies of the 72 tapes it intended to use at trial, but refused to provide copies of the balance of the 20 hours of conversations in its possession, even at the defendant's expense. Instead, the government made the original tapes available for inspection at its offices.

■ Rule 16(a)(1)(C) of the Federal Rules of Criminal Procedure requires the government to "permit the defendant to

inspect and copy ... tangible objects ... which are in the possession ... of the government, and which are material to the preparation of the defendant's defense...." To successfully press a claim that the government violated this rule, the defendant must make at least a *prima facie* showing that the requested items are material to his defense. *United States v. Maniktala*, 934 F.2d 25, 28 (2d Cir.1991); *United States v. Buckley*, 586 F.2d 498, 506 (5th Cir.1978), *cert. denied*, 440 U.S. 982, 99 S.Ct. 1792, 60 L.Ed.2d 242 (1979). Dawes has made none; despite the fact that his attorney ultimately accepted the government's offer to let him review the tapes in the U.S. Attorney's offices, he has not identified a single piece of evidence that would have benefitted his defense. We do not know why the government was unwilling to provide Dawes with copies of the remaining tapes (there were only 20 hours of recordings), particularly when Dawes offered to pay for the copies, but whatever the reason, the government's action did not prejudice Dawes.

### IV. Sufficiency of the Evidence

#### A. Randy Thompson

Randy Thompson asserts that the evidence presented at trial was insufficient to establish beyond a reasonable doubt that he conspired to distribute cocaine. He maintains that his conviction rests solely on the statements of co-conspirators and cites our opinion in *United States v. Martinez de Ortiz*, 883 F.2d 515 (7th Cir.1989), for the proposition that co-conspirator statements cannot be used to establish his membership in a conspiracy. Thompson's exposition of the law is incomplete. The admissibility of co-conspirator *testimony* was not at issue in *Martinez de Ortiz;* what concerned the court was the admissibility of *out-of-court* statements made by co-conspirators. Co-conspirator testimony about the words and deeds of a defendant are not hearsay; the words and deeds of the defendant, while themselves out-of-court statements, are admissions, and because the testimony is offered in court, the statements of the co-conspirator are not hearsay either. At issue in *Mar-*

*tinez de Ortiz* was the situation in which a witness (whether or not a co-conspirator) testifies that one of the defendant's co-conspirators (rather than the defendant himself) told the witness something about the defendant's involvement in the conspiracy. That testimony implicates the concerns of the hearsay rule and confrontation clause of the sixth amendment, because the declarant (the co-conspirator) is not available for cross-examination.

The panel opinion in *Martinez de Ortiz*, to which Thompson refers us, and our *en banc* decision affirming the panel, 907 F.2d 629 (7th Cir.1990), *cert. denied*, —— U.S. ——, 111 S.Ct. 684, 112 L.Ed.2d 676 (1991), held that out-of-court statements may be introduced as evidence of the defendant's actions to establish the defendant's participation in a conspiracy. *See* 883 F.2d at 521, 907 F.2d at 634–35; *see also United States v. Nichols*, 910 F.2d 419, 421 (7th Cir.1990). Saying that out-of-court statements of co-conspirators may be *used* (in conjunction with other evidence) to establish a defendant's participation in a conspiracy and saying that they are (standing alone) sufficient to do so are two different things. In *Martinez de Ortiz* we expressly reserved judgment on the question of whether a conspiracy conviction based solely upon such statements may stand. 907 F.2d at 632. *Nichols* observes in dicta that they cannot. 910 F.2d at 421. Thompson puts the question to us now, but his is not the case in which to answer it. His protests notwithstanding, there was significant evidence to corroborate the out-of-court co-conspirator statements introduced against him. Jennifer Bailey and Chris Guddie supplied the most important point of corroboration when each testified that Todd Thompson dispatched them to Los Angeles on several occasions to deliver suitcases filled with cash to Randy Thompson. Todd Thompson's statements to Guddie and others that Randy was a source of cocaine are out-of-court statements made by a co-conspirator, and it is the sufficiency of such statements that *Martinez de Ortiz* and *Nichols* question. But when Bailey and Guddie testify at trial that, true to

Todd's word, Randy met the couriers and took custody of the suitcases filled with cash, Todd's out-of-court statements look more credible. This is the same type of corroborating evidence that obviated the need to consider whether co-conspirator statements were, standing alone, sufficient to support a conviction in *Martinez de Ortiz*. *See* 907 F.2d at 633 ("Linda Cabeza's taped reference to a 'Margarita' as her source of cocaine is a slim basis for concluding that ... Martinez de Ortiz joined a conspiracy—until Martinez de Ortiz shows up in Chicago, in Linda's company, talking about 'kilos.'").

There is no evidence that Randy Thompson personally handled any drugs or spoke about drugs with any of the witnesses, a void that prompts him to claim that co-conspirator testimony notwithstanding, the evidence was insufficient to convict him. It is unreasonable to infer from his receipt of some suitcases full of cash, he insists, that he was a member of a drug conspiracy. The jury, however, was entitled to view the suitcase transfers against the backdrop of the co-conspirator statements. His actions in taking custody of the suitcases establish his agreement to join the conspiracy of which the suitcases were part; his cousin's words established that the conspiracy was drug-related.

■■■ Alternatively, Thompson asserts that the evidence against him established only that he sold cocaine to his cousin Todd, not that he conspired with Todd and his associates to distribute the cocaine in Milwaukee. If the evidence against him established only that he sold cocaine to his cousin, his conviction could not stand; a mere sale of drugs is insufficient to establish a conspiratorial agreement beyond the agreement inherent in the sale itself. *United States v. Townsend*, 924 F.2d 1385, 1394 (7th Cir.1991); *United States v. Baker*, 905 F.2d 1100, 1106 (7th Cir.), *cert. denied*, — U.S. ——, 111 S.Ct. 206, 112 L.Ed.2d 167 (1990); *United States v. Ford*, 324 F.2d 950, 952 (7th Cir.1963). Here there was more. The jury was well-acquainted with the typical size of Todd Thompson's cocaine purchases—Bailey was carrying four kilos back to Thompson when she was arrested—and could reasonably infer that Todd was obtaining similarly large quantities from Randy. Todd Thompson told Gerald Scott, one of his customers in Milwaukee, that his cocaine source was Randy Thompson in Los Angeles, and Scott contributed to the cash collections, which he testified ranged from $200,000 to $260,000, that Todd Thompson and Terry Wynn sent to Randy in Los Angeles to purchase cocaine. The mere size of the deals does not show that Randy agreed to join his cousin's distribution ring, *Baker*, 905 F.2d at 1106, but it does show that he knew that Todd was a distributor. "When a dealer buys for resale from another dealer ... it is reasonable to infer 'a limited agreement to distribute' between the two dealers," *United States v. Sergio*, 934 F.2d 875, 879 (7th Cir.1991) (quoting *Townsend*, 924 F.2d at 1392), though not necessarily between their respective associates.

Moreover, the jury could reasonably have inferred that the deals between the two cousins were more than isolated arms-length transactions. These were not simple cash-and-carry exchanges on the street corner; the evidence, viewed as it must be after conviction in the light most favorable to the government, showed that Todd Thompson was purchasing hundreds of thousands of dollars of cocaine from sources in Los Angeles and shipping it across country to Milwaukee. Todd, accompanied by Tony Weathers, made a trip to Los Angeles for the sole purpose of discussing drug transactions with Randy. Todd introduced Weathers to Randy, though the two cousins did not discuss drugs while he was with them. Afterward, they bought cocaine from Randy not once, but on at least four different occasions. Chris Guddie and Jennifer Bailey each made two trips from Milwaukee to Los Angeles, carrying a suitcase full of cash on each trip. Once in Los Angeles, the couriers rented motel rooms and contacted Randy Thompson; he picked up the cash from the couriers and in turn arranged to have other couriers drive cocaine to Milwaukee where Todd would receive it. Much could go wrong during this course of events, and

sometimes did. Bailey contacted the wrong supplier once in Los Angeles; on at least two occasions Todd told those who had put up money for the purchases that his couriers had been robbed; and, of course, there was always the threat of detection by law enforcement officials, a danger finally realized in February when Bailey was arrested carrying four kilograms of cocaine she had obtained from Donovan Dawes.

The complexity of these arrangements and the number of transactions lend weight to the inference of conspiratorial agreement because they reveal a high degree of trust and cooperation between Randy and Todd Thompson. Conspiracies make it easier to commit complicated crimes, *Townsend*, 924 F.2d at 1394, and from this evidence the jury could have concluded that the cousins were working together to obtain and distribute cocaine. Todd Thompson told Guddie that he was going to deal with Randy because Randy needed the money and because Donovan Dawes' prices were too high (a fact that makes it doubtful the government could have established that Dawes and Randy were co-conspirators; they were, it appears, competitors). Randy also took an interest in his cousin's deals even when he wasn't personally involved. Bailey contacted Randy on a third trip to Los Angeles, only to find out that he wasn't expecting her. Rather than leave Bailey to her own devices, he made a call back to Milwaukee to apprise Todd and Weathers of the situation; shortly thereafter, Weathers contacted Bailey and told her to call Dawes to arrange the transfer. In light of this evidence, the jury's conclusion that Randy was more than a disinterested purveyor of cocaine seems reasonable.

### B. Terry Wynn

Like Randy Thompson, Terry Wynn claims that the evidence was insufficient to support his conviction. Claim, however, is all that he does. His brief on the point consists of less than a page, and does not refer to a single fact or piece of evidence. Wynn's reluctance to discuss the evidence is understandable, however, as it clearly established that he was intimately involved in many of Thompson's drug transactions. He was, along with Thompson, involved in collecting the cash sent to California to purchase cocaine, and recruited dealers, like Gerald Scott, to distribute the drugs when they reached Milwaukee. The two divvied up the shipments, but shared customers and cooperated together when making sales. The jury was certainly entitled to conclude that Wynn and Thompson conspired together to distribute cocaine.

That being said, we turn to a related challenge Wynn and Randy Thompson raise to their sentences. At Wynn's sentencing hearing, the government asserted that "Terry Wynn is convicted beyond a reasonable doubt of being a member of this conspiracy. Just on general conspiracy theory, he is responsible for all the conduct involved in this conspiracy." Tr. at 13. The district court agreed and used the guideline range applicable to crimes involving between 50 and 100 kilograms of cocaine, a range the court concluded encompassed the total quantity of drugs attributable to the activity of the parties named in the indictment, to compute Wynn's base offense level. The district court used the range applicable to crimes involving between 15 and 50 kilograms of cocaine to sentence Randy Thompson. Wynn and Thompson objected at sentencing that their involvement with Todd's activities was more limited; on appeal they claim that the district court failed to make individualized determinations of what quantities of cocaine trafficking were reasonably foreseeable to them as required by § 1B1.3 of the Sentencing Guidelines. We agree.

The government's premise that a conspiracy conviction reflects membership in a group is faulty. A conspiracy is an agreement, not a group. *Townsend*, 924 F.2d at 1389; *United States v. Varelli*, 407 F.2d 735, 741–42 (7th Cir.1969). A conviction under 21 U.S.C. § 846 does not establish beyond reasonable doubt that the defendant conspired with every other person charged in the indictment (or with any of them, for that matter); it simply means

that he agreed with at least one other person to violate the drug laws. "[T]he government doesn't have to prove with whom a defendant conspired; it need only prove that the defendant joined the agreement alleged, not the group." *Townsend*, 924 F.2d at 1389. Unquestionably, Wynn and Thompson are liable for the quantities of drugs they agreed to distribute, whether or not they were personally involved in each transaction. But the nature of this derivative liability makes it imperative to determine the scope of the conspiratorial agreement each joined, for "the scope of an agreement determines the scope of a conspiracy, which in turn determines the scope of derivative liability under guidelines." *United States v. Sergio*, 934 F.2d 875, 878 (7th Cir.1991). As the commentary to the "relevant conduct" provision of the guidelines explains,

> "[i]n the case of criminal activity undertaken in concert with others, whether or not charged as a conspiracy, the conduct for which the defendant 'would be otherwise accountable' also includes conduct of others in furtherance of the execution of the jointly-undertaken criminal activity *that was reasonably foreseeable by the defendant. Because a count may be broadly worded and include the conduct of many participants over a substantial period of time, the scope of the jointly-undertaken criminal activity, and hence relevant conduct, is not necessarily the same for every participant.*"

U.S.S.G. § 1B1.3, comment. (n.1) (emphasis added). Here, the government, and the district court, assumed that because the total quantity of drugs attributable to the defendants named in Count 1 of the indictment (the conspiracy count) exceeded 50 kilograms, Wynn should be held accountable for that amount. The court held Randy Thompson accountable for only 30 kilograms because he didn't begin supplying cocaine to his cousin until later. The court did not determine, however, whether either Wynn or Thompson could fairly be said to have conspired with each individual named in the indictment (which is another way of saying that the court did not determine the

scope of each defendant's agreement) as the guidelines require. Without such a determination, the court could not accurately calculate the quantity of cocaine for which these defendants can reasonably be held accountable. We therefore vacate their sentences and remand their cases to the district court to make this determination with respect to each. *See, e.g., United States v. Tolson*, 760 F.Supp. 1322 (N.D.Ind.1991).

## V. Jury Instructions

Randy Thompson maintains that the district court erred by failing to give three instructions to the jury. The first instruction concerns the cross-examination of Chris Guddie; Thompson asserts that the district judge should have instructed the jury that Guddie's testimony had been impeached. Second, Thompson claims that the judge should have given an instruction that focused on the case's "family aspects." And third, he submits, the court should have explained more fully to the jury that co-conspirator statements cannot be used as evidence that a defendant joined a conspiracy.

 These claims suffer from a number of deficiencies. Chief among them, Thompson never requested such instructions at trial and has therefore waived his objection absent plain error, that is, error so fundamental that it entails a miscarriage of justice. *United States v. Silverstein*, 732 F.2d 1338, 1349 (7th Cir.1984), *cert. denied*, 469 U.S. 1111, 105 S.Ct. 792, 83 L.Ed.2d 785 (1985). Thompson's appellate counsel has compounded the problem by neglecting to offer the text of the proposed instructions in his brief.

 Considering only the brief descriptions that have been offered, we observe that the absence of such instructions certainly caused no miscarriage of justice because each rests on a misconception about the role of the trial court. Thompson's requested "impeachment" instruction is simply an instruction that states that Guddie's testimony on direct was not credible, but the success of impeachment is for the jury, not the judge, to decide. The

instructions the judge gave to the jury regarding their duty to assess the credibility of the witnesses were adequate to inform the jury that it did not have to accept as gospel the testimony of the prosecution's witnesses, and fully explained to the jurors that it was up to them to resolve inconsistencies in the testimony presented. Thompson also wants an instruction that it was not illegal *per se* for Randy to associate with, or do favors for, his cousin Todd. That much, of course, is true, and the court's instructions on conspiracy liability were more than sufficient to tell the jury that much: the court advised the jury of the defendant's presumption of innocence; of the government's burden of proof; of the dangers of co-defendant testimony, of the elements of conspiracy; that mere association of individuals does not show a conspiracy; and warned the jury at least twice to give separate consideration to each defendant. What Thompson wants is an instruction that emphasizes the legitimate reasons Randy had to associate with Todd; that is a job for counsel during closing argument, not for the court when instructing the jury. As for the use of co-conspirator testimony, the proposed instruction is simply incorrect. As we held in *Martinez de Ortiz*, once the judge admits co-conspirator testimony under Federal Rule of Evidence 104, the jury may consider the evidence for any purpose. 907 F.2d at 634–35. Thompson was entitled to none of the instructions he now requests.

## VI. Waiver of Right to Testify

Randy Thompson did not testify at trial. Nor did he attempt to do so. On appeal, he insists that the district court should have affirmatively inquired about his decision not to take the stand to ensure that it was the product of a knowing and intelligent waiver of his right to testify on his own behalf. We have previously stated that courts have no affirmative duty to determine whether a defendant's silence is the result of a knowing and voluntary decision not to testify—*see United States v. Muehlbauer*, 892 F.2d 664, 669 (7th Cir. 1990); *Ortega v. O'Leary*, 843 F.2d 258, 261 (7th Cir.), *cert. denied*, 488 U.S. 841,

109 S.Ct. 110, 102 L.Ed.2d 85 (1988)—and the other circuits we have found that have addressed the question are in accord. *See United States v. Martinez*, 883 F.2d 750, 760 (9th Cir.1989); *United States v. Bernloehr*, 833 F.2d 749, 751–52 (8th Cir.1987); *United States v. Systems Architects, Inc.*, 757 F.2d 373, 375–76 (1st Cir.), *cert. denied*, 474 U.S. 847, 106 S.Ct. 139, 88 L.Ed.2d 115 (1985); *United States v. Janoe*, 720 F.2d 1156, 1161 (10th Cir.1983), *cert. denied*, 465 U.S. 1036, 104 S.Ct. 1310, 79 L.Ed.2d 707 (1984). In *Ortega* we assumed that the trial court erred by refusing to permit a defendant to testify when the defendant had told the court that he wanted to testify. 843 F.2d at 262. By contrast, there is no indication at all that Thompson desired to testify, and he certainly knew he had the right to do so as his two co-defendants stated on the record (at their own initiative) that they did not wish to do so. We agree with Thompson's counsel that an inquiry by the trial court into the defendant's desire to testify has much to recommend it, but cannot accept the view that such an inquiry is constitutionally required absent some indication that the defendant has been prevented from exercising that right. Thompson's reference to the inquiry required before a defendant may waive objection to a potential conflict of interest affecting his counsel is not helpful, because the potential conflict renders suspect the advice as to the waiver received by the defendant from counsel. Moreover, even in that scenario, the trial court has no obligation to conduct an inquiry unless it is aware, or should be aware of the potential conflict. *United States v. Akinseye*, 802 F.2d 740, 744 (4th Cir.1986), *cert. denied*, 482 U.S. 916, 107 S.Ct. 3190, 96 L.Ed.2d 678 (1987). Despite Thompson's assertion that his trial counsel was inexperienced (he points to nothing in the record to buttress that claim), there is no inherent reason to suspect that the advice he received was not offered to serve his best interests. His appellate counsel disagrees with the tactical decision made by his trial counsel, but that is not a reason to reverse his conviction.

## VII. Mid-trial Bail Revocation

Six days into the trial, the district court granted a motion by the government to revoke bail for the defendants. The defendants were taken into custody and for the remaining three days of trial four United States marshals attended the trial. One sat behind each of the three co-defendants and the fourth sat beside the gate between the gallery area and the litigants. Defendants Todd Thompson and Terry Wynn maintain that the district court's action denied them a fair trial because it hindered their ability to communicate with their lawyers and because it indicated to the jury that the district judge had concluded that they were guilty.

■ The defendants' claim that the presence of the marshals in the courtroom after the court revoked bail suggested to the jury that the judge had concluded that the defendants were guilty has some superficial appeal. The court's evaluation of the government's case was, of course, a significant factor in its decision to revoke the defendant's bail. The government cited the strength of its case as one of the principal factors justifying the revocation of bail and the district court agreed (out of the jury's hearing), stating:

> "I must confess that as I listened to this testimony I wondered on more than one occasion how it was that these two defendants, and to a lesser degree, Randy Thompson, was out on bond.... There is enough corroborating testimony and evidence that would lead one to attach some credence to a portion of the testimony of each of the witnesses that have testified up to this point.... The weight of the evidence up to this point against these defendants is, to say the least, overwhelming."

Tr. 1223–25. We disagree, however, with the defendants' view that the subsequent presence of marshals in the courtroom was inherently prejudicial to the defendants (in this type of challenge we must look to the risk of prejudice to the defendant rather than demanding concrete evidence of a tainted verdict, which is seldom discoverable). The issue here is the significance of the *timing* of the introduction of the marshals into the courtroom, for the defendants concede that the presence of identifiable security officers in the courtroom is not prejudicial *per se. See Holbrook v. Flynn,* 475 U.S. 560, 569, 106 S.Ct. 1340, 1346, 89 L.Ed.2d 525 (1986). We fail to see the significance of the fact that the marshals were present for only the latter portion of the trial. We grant that it is *possible* that the arrival of the marshals suggested to some of the jurors that the defendants must be guilty, or that the judge thought the defendants must be guilty, but that is an inference available to the jurors when security personnel are present in the courtroom from the beginning of the trial as well. The fact is that jurors do not know why security officers are present in courtrooms; the wide range of inferences that a juror might reasonably draw from the presence of security personnel is "the chief feature" that distinguishes the use of identifiable security officers from other courtroom practices that have been held to be inherently prejudicial. *Flynn,* 475 U.S. at 569, 106 S.Ct. at 1346. That security personnel appear only after the trial has begun does not, in our view, significantly narrow the range of inferences available to jurors to explain their presence. When we consider also that the marshals present at the defendants' trial were not uniformed, and therefore may not have even been recognized by the jurors as security personnel, the scope of possible explanations becomes even larger, and the risk of undue prejudice diminishes commensurately. Finally, we note our skepticism of the defendants' claim that the introduction of the marshals was inherently prejudicial in light of their failure even to mention the possibility of prejudice at trial, their failure to propose any alternative courtroom arrangement, and their failure to request any sort of jury instruction regarding the presence of security personnel in the courtroom.

■ The only concern raised by the defendants at trial was that the bail revocation would hinder their ability to adequately prepare their defense by preventing them from consulting with their lawyers. Neither defendant explains how their abili-

ty to communicate with their lawyers was compromised. The defendants were confined at the nearby Racine County Jail, which was equipped with interview rooms. They were taken into custody just before a three day weekend that afforded an extended period of time for consultation with counsel before the trial recommenced. The court granted the defendants an additional half-day continuance to consult with counsel as well, and directed the marshals to bring the defendants to court each day early enough to give them time to consult with their attorneys before court reconvened. In short, the defendants were placed in custody; they were not denied access to counsel.

■ Moreover, once again we fail to see how the *timing* of the court's bond revocation itself prejudiced the defendants. Although incarceration does make such communication more difficult, that is the case whether bail is denied after arrest, or just before trial, or during the course of the trial. *Revoking* bail only after the government has presented much of its evidence at trial provides greater accommodation, rather than less, to the defendant's right to consult with counsel. It would indeed be perverse were we to condemn as unduly prejudicial the revocation of bail at a late stage in the prosecution of the defendants case. To do so could create an incentive for prosecutors to seek, and judges to grant, bail revocations prior to trial to avoid the very speculative risk of prejudice these defendants have identified.

### VIII. Obstruction of Justice

#### A. Denials of Drug Use

■ The district court enhanced the base offense levels for Todd Thompson and Terry Wynn each by two levels because they both denied using cocaine while on bail during the course of the trial. Both defendants had tested positive for cocaine, however, and relying on our decision in *United States v. Jordan*, 890 F.2d 968 (7th Cir.1989), the district court concluded that denying drug use while on bail constitutes grounds to apply the obstruction of justice enhancement of § 3C1.1 of the guidelines.

*See also United States v. Delgado*, 936 F.2d 303, 307 (7th Cir.1991) (following *Jordan* ). After our decision in *Jordan*, however, and after the district court sentenced Thompson and Wynn, the Sentencing Commission amended the commentary to § 3C1.1 to clarify the operation of that guideline. *See* Guideline Amendment No. 347. The revised commentary makes clear that the interpretation of § 3C1.1 we adopted in *Jordan* was not that intended by the Sentencing Commission (*Delgado* followed *Jordan* without addressing the 1990 revisions to the commentary), and we therefore consider anew the issue of whether a defendant's drug use while on bail triggers the obstruction enhancement of § 3C1.1. *See United States v. Caicedo*, 937 F.2d 1227, 1234 (7th Cir.) (proper to consider *ex post* revisions to guideline commentary that were intended merely to clarify, rather than to substantively change, the operation of the guideline); *United States v. Fiala*, 929 F.2d 285, 290 (7th Cir.1991) (same). *Accord United States v. Urbanek*, 930 F.2d 1512, 1514–15 (10th Cir.1991); *United States v. Nissen*, 928 F.2d 690, 694–95 (5th Cir.1991); *United States v. Scroggins*, 880 F.2d 1204, 1215 (11th Cir.1989), *cert. denied*, —— U.S. ——, 110 S.Ct. 1816, 108 L.Ed.2d 946 (1990); *United States v. Guerrero*, 863 F.2d 245, 250 (2d Cir.1988).

Before the Sentencing Commission revised the commentary to § 3C1.1 in 1990, the introductory paragraph to the commentary explained that the enhancement was intended "for a defendant who engages in conduct calculated to mislead or deceive authorities ... or otherwise to willfully interfere with the disposition of criminal charges, in respect to the instant offense." Among the types of conduct identified by the commentary as providing a possible basis for applying the enhancement was "furnishing material falsehoods to a probation officer in the course of a presentence or other investigation for the court." Former Application Note 1(e). On the basis of this guidance, we concluded in *Jordan* that the defendant's denial of drug use during the sentencing stage of his case constituted an obstruction of justice during the prose-

cution and disposition of the drug-related charges pending against him. 890 F.2d at 973. When the Sentencing Commission revised the commentary to § 3C1.1, however, it provided additional guidance to distinguish between defendants who make an affirmative attempt to mislead authorities during the pendency of the investigation and prosecution of their case and those, like Todd Thompson and Wynn, who simply exercise their constitutional right to refrain from incriminating themselves to authorities by denying wrongdoing. In the revised commentary, the Commission plainly states that "[a] defendant's denial of guilt (other than a denial of guilt under oath that constitutes perjury), refusal to admit guilt or provide information to a probation officer, or refusal to enter a plea of guilty is not a basis for application of this provision." § 3C1.1 commentary (n.1). We see no basis for distinguishing between statements made to probation officers and those made to pretrial services officers, and therefore conclude that neither Thompson nor Wynn merited an enhancement for obstruction of justice based on their denials that they used drugs during the course of the trial.

### B. Denial of Violation of Release Condition

▉ The district court also based Todd Thompson's obstruction enhancement on his denial that he had slept overnight at a friend's home while awaiting sentencing. A condition of Thompson's release on bond pending sentence was that he reside at his sister's home. During the course of the trial, however, Thompson was discovered asleep at the home of a friend, Gerald Scott, when DEA agents arrested Scott on charges unrelated to Thompson. According to the presentence report, Thompson told a DEA agent that he had stayed overnight at Scott's home, sleeping there with a girlfriend. When a probation officer questioned Thompson about this incident, Thompson stated that he had fallen asleep at Scott's house for only one or two hours. The district court concluded that the discrepancy between these two statements warranted an enhancement under § 3C1.1

for obstruction of justice and we agree. At his sentencing hearing, Thompson's attorney admitted that Thompson lied to the probation officer investigating his compliance with the conditions imposed by the court upon his release, arguing only that Thompson's "fib" was not a material falsehood. Application Note 5 of the revised commentary defines "material" statements as those statements that, "if believed, would tend to influence or affect the issue under determination." Thompson apparently construes "the issue under determination" to mean the charges on which he was indicted or tried, or perhaps the investigation the police were pursuing that lead to Scott's arrest. In our view, however, "the issue under determination" is the issue about which a defendant is being questioned by authorities, in this case, whether Thompson had complied with the release conditions imposed by the court. Application Note 3(h) states that "providing materially false information to a probation officer in respect to a presentence or other investigation for the court" is an example of a case in which an obstruction enhancement may be warranted, and comprises a broader range of inquiries than those pertaining to the defendant's guilt or innocence. We conclude that the district court did not abuse its discretion by applying the enhancement to Thompson as the court unquestionably had a legitimate interest in monitoring his compliance with the release conditions it had imposed.

### IX. Role in the Offense

▉ The district court adjusted the base offense levels for both Randy and Todd Thompson on the basis of their roles in the offenses charged. Todd received a four-level increase as a leader pursuant to § 3B1.1(a) of the Sentencing Guidelines. That determination is one of fact to which we must defer unless we conclude that it is clearly erroneous. *United States v. Herrera*, 878 F.2d 997, 1000 (7th Cir.1989). Todd's objection to that finding is premised on a mistaken presumption that the district judge enhanced his sentence on the basis of testimony presented at the sentencing

hearings of his co-defendants, thereby violating his rights under the confrontation clause of the sixth amendment. In reality, the district court referred only to interpretations of various guidelines provisions it had adopted at the other hearings, not to evidence presented at those hearings (none was presented), so the basis of his objection is unfounded. Moreover, we note that Todd offered no objection to the factual summary contained in his presentence report when asked for objections by the district judge. That report, as did the evidence adduced at trial, presented more than enough material to support the court's finding that Todd was a leader of the conspiracy. He located the cocaine sources; he organized the Milwaukee to Los Angeles shipments; he recruited couriers; he stored the cash and cocaine in his home; he, along with Tony Weathers, appeared to have been the parties who profited significantly from the illegal activity; he alone was referred to as "the King" and "Big Cheese."

▮▮▮ The district judge found that Randy was a "manager or supervisor" of the conspiracy within the meaning of § 3B1.1(b) of the Guidelines, and accordingly increased his base offense level by three levels. The district court's finding was based upon three factors: Randy's role in setting the price the conspiracy paid for the cocaine; his role in controlling the deliveries of cash to Los Angeles; and his role in delivering the cocaine to Milwaukee.[1] The evidence as to each of these factors, however, was insufficient to judge the scope of Randy's role. All suppliers play some role in establishing price (even if limited to taking a price dictated by a competitive market), so that fact alone cannot be dispositive of status under § 3B1.1. If a supplier charges a supracompetitive price for his goods (high search costs might make the

buyer vulnerable to such exploitation), he will have a great deal to say about the price the conspiracy pays, but he will certainly not be exercising a leadership role within the conspiracy (the logical conclusion in such a case is that the supplier is not a leader of the conspiracy but an exploiter—*see Townsend*, 924 F.2d at 1398). The government presented no other evidence of Randy's control over the prices the conspiracy was willing to pay; Randy met once with Todd to discuss prices, but that is all we know.

The size of the transactions between the two cousins also influenced the district court's finding. *See* Sentencing Tr. at 47 ("how many people would be able to lay their hands on that quantity of cocaine?"). While his ability to secure a large quantity of cocaine suggests that he *may* have played a significant role in some drug conspiracy, it fails to show that he played an active part in his cousin's operations. The links tying different levels of a chain of distribution vary in strength from chain to chain; some are strong enough to support the inference that the chain is a single organization, some are not. *Townsend*, 924 F.2d at 1391–92. One's status as a middleman in a drug distribution chain does not, standing alone, make one a manager or supervisor. *United States v. Fuller*, 897 F.2d 1217, 1220–21 (1st Cir.1990). Here, the government makes no claim that those with whom Randy dealt to obtain the cocaine also conspired with Todd Thompson; it simply alleges that Randy Thompson was party to both conspiracies. But the fact that Randy may have been a member of two operations, playing a significant role in one, does not mean that he must have played a significant role in both. He may well have been content to supply his cousin with cocaine and to let Todd take it

---

1. The district court's discussion of its findings is quoted below:

The degree of the defendant's responsibility is somewhat less clear. There is no question but what this defendant did have something to do with the establishment of price. That's borne out by the discussions between he and Mr. Thompson. There is no question, as counsel pointed out, but what he decided the manner in which the cocaine would be deliv-

ered to the buyers here in the Eastern District, and he determined whether it would be sent back with the courier in the suitcase, or whether it would be sent back by other means. There is really no question but what this defendant could and did have a say as to when these deliveries and shipments would be made.
Sentencing Tr. at 55.

from there; the government presented no evidence that he played any larger role in Todd's affairs.

Similarly, the evidence fails to support the significance attributed to Randy's involvement in the Los Angeles transactions by the district court. Specifically, there is no evidence to support the view that Randy controlled the couriers in any fashion: when Todd Thompson dispatched Bailey and Guddie to Los Angeles, they made their own travel arrangements; they selected a hotel at which to make the transfer; they called Randy upon their arrival; he came to the hotel; they gave him the cash; he did not count the cash; the couriers made their arrangements to return to Milwaukee. By way of contrast, compare the routine when the couriers delivered the cash to Todd Thompson's usual supplier, Donovan Dawes: Dawes instructed the couriers to utilize different motels on each trip; Dawes counted the money; Dawes instructed the couriers to wait at the motel until he returned with the cocaine; Dawes contacted the couriers in Milwaukee upon their return to verify that they had experienced no problems en route. As for the subsequent delivery of the cocaine to Milwaukee, the only evidence that Randy had anything to do with making those arrangements (as opposed to his participation in the arrangements) was Chris Guddie's statement that Randy told her that "he usually had someone drive it back." That statement is too insubstantial and ambiguous to support the inference that Randy must have been responsible for making the arrangements to transport hundreds of thousands of dollars worth of cocaine back to Milwaukee, particularly when on cross-examination Guddie admitted that she couldn't be sure whether Randy or Todd had told her about these arrangements. In short, the government presented virtually no evidence that Randy exercised any control or responsibility for the affairs of the conspiracy beyond showing up at an appointed place and time to accept deliveries of cash, and such evidence does not a manager make.

## X. Consecutive Sentence on Weapons Count

Todd Thompson was convicted of possession of a 9 millimeter semi-automatic pistol in the course of drug trafficking activity in violation of 18 U.S.C. § 924(c). DEA agents discovered the weapon in the apartment of Tony Weathers, one of Thompson's co-conspirators; Thompson was convicted of possession under the *Pinkerton* doctrine that views co-conspirators as mutual agents accountable for the foreseeable acts of other members of the conspiracy. *See Pinkerton v. United States,* 328 U.S. 640, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946). Thompson does not challenge his conviction on this count, but maintains that the imposition of the consecutive five-year sentence mandated by the statute on top of the thirty-year sentence he received as the result of his drug convictions constitutes cruel and unusual punishment in violation of the eighth amendment.

We cannot agree. Whether the eighth amendment forbids sentences that are "disproportionate" to the offense committed, or only those that are "grossly disproportionate," see the debate in *Harmelin v. Michigan,* — U.S. —, 111 S.Ct. 2680, 115 L.Ed.2d 836 (1991), does not matter in this case as the sentence Thompson received was neither. In *United States v. Powell,* 894 F.2d 895, 900 (7th Cir.), *cert. denied,* — U.S. —, 110 S.Ct. 2189, 109 L.Ed.2d 517 (1990), and *United States v. Gironda,* 758 F.2d 1201, 1214 (7th Cir.), *cert. denied,* 474 U.S. 1004, 106 S.Ct. 523, 88 L.Ed.2d 456 (1985), we rejected double jeopardy challenges to § 924(c), observing that it was not unreasonable for Congress to acknowledge the violence that attends the drug trade in this country and to attempt to disarm those involved by imposing cumulative punishment when members of a conspiracy employ weapons to further their trade. By the same token, we surely cannot say that five years of additional incarceration is a disproportionate response to the escalation of violence that attends armed drug trafficking.

XI. Conclusion

To sum up, we conclude that Dawes suffered no prejudice from the prosecutor's misuse of the grand jury after he was indicted; that the denial of his motion to suppress evidence obtained by the wiretap of Thompson's home was correct; and that he failed to identify any prejudice stemming from the government's refusal to provide copies of every conversation recorded over the wiretap. The evidence was sufficient to support the conspiracy convictions of Randy Thompson and Terry Wynn, but both of these appellants must be resentenced after the district court makes the findings required by § 1B1.3 of the guidelines. The district court was not required to give the instructions Randy Thompson requests on appeal, nor was it required to affirmatively inquire into his decision not to testify. Neither Wynn nor Todd Thompson was prejudiced by the court's mid-trial bail revocation. The district court's determinations that Randy Thompson was a supervisor was not supported by the evidence presented by the government; Todd Thompson's enhancement as a leader and organizer of criminal activity, however, was. Neither Terry Wynn nor Todd Thompson warranted an obstruction of justice enhancement of their sentences for denying drug use while on bail, but the obstruction enhancement was nevertheless appropriate for Thompson as he lied to a pretrial services officer. And finally, Todd Thompson's five-year sentence on the firearms count was not disproportionate to the offense. For these reasons, the convictions of the appellants are AFFIRMED; the sentences of Randy Thompson and Terry Wynn are VACATED, and their cases are REMANDED to the district court for resentencing.